KINCAID v CARDWELL

Docket No. 310045. Submitted February 12, 2013, at Lansing. Decided
    April 18, 2013, at 9:00 a.m.
    Brenda Kincaid brought a medical malpractice action in the St. Clair
        Circuit Court against Laura LaMar, D.P.M.; LaMar's practice, Hodor
        and Frascone D.P.M., P.C.; Robert Cardwell, M.D.; and Cardwell's
        practice, St. Clair Cardiovascular Surgeons, P.L.C. She subsequently
        amended her complaint to name only Cardwell and St. Clair Cardio-
        vascular as defendants. Following a foot injury, Kincaid had seen
        LaMar, who subsequently referred her to Cardwell. Kincaid's first
        visit to Cardwell was on April 25, 2008. Cardwell ordered several
        tests, and Kincaid saw him several more times as her symptoms
        worsened. On July 9, 2008, Cardwell referred Kincaid to another
        doctor to consider whether she needed a toe amputated. On July 21,
        2008, Kincaid's leg was amputated below her knee. Kincaid's com-
        plaint alleged that Cardwell and St. Clair Cardiovascular had
        breached the standard of care for several months up to the amputa-
        tion. Cardwell and St. Clair Cardiovascular moved for summary
        disposition under MCR 2.116(C)(7). Relying on Kincaid's April 5,
        2010, notice of intent to sue (NOI), they asserted that Kincaid's claim
        had accrued on April 25, 2008; that with tolling of the limitations
        period during the notice period, Kincaid had until October 25, 2010,
        to file her complaint; and that her complaint filed on November 30,
        2010, was thus untimely. Kincaid asserted that Cardwell had
        breached the standard of care during subsequent appointments in
        June and July 2008, though she did not specify particular acts or
        omissions, and that she accordingly had until December 7, 2010, to
        sue. The court, Cynthia A. Lane, J., concluded that Kincaid's claim
        had accrued on April 25, 2008, and granted Cardwell and St. Clair
        Cardiovascular summary disposition. Kincaid appealed.
        The Court of Appeals held:
        1. Under MCL 600.5805(6), the period of limitations for a
    medical malpractice action is two years from the date the claim
    accrued. MCL 600.2912b(1) provides that a plaintiff must give the
    defendant an NOI not less than 182 days before the plaintiff
    commences the action, and under MCL 600.5856(c) the limitations

period is tolled for the 182-day notice period if the plaintiff gave the NOI before the limitations period expired. Kincaid gave her NOI within two years of April 25, 2008 (the earliest accrual date possible) and thus was entitled to the full 182 days of tolling. Consequently, if her medical malpractice claim accrued on or after June 1, 2008 (which was two years and 182 days before November 30, 2010, the date she filed her complaint), her claim would be timely. If it accrued before that date, it would be barred under MCL 600.5805(1).

2. Under the last-treatment rule, the cessation of the ongoing patient-physician relationship, that is, the last day that the physician treated the plaintiff, marked the point at which the limitations period for medical malpractice began to run. In 1986 PA 178, the Legislature abrogated the last-treatment rule. MCL 600.5838a(1) now provides that a medical malpractice claim accrues at the time of the act or omission that is the basis for the claim. The Legislature did not limit a plaintiff to asserting a single claim for medical malpractice for any given injury. Because a plaintiff's injury can be causally related to multiple acts or omissions, it is possible for the plaintiff to allege multiple claims of malpractice premised on discrete acts or omissions (even when those acts or omissions lead to a single injury) and those claims will have independent accrual dates determined by the date of the specific act or omission at issue. The fact that a plaintiff may be able to plead multiple accrual dates, however, does not mean that the plaintiff may resurrect the last-treatment rule through ambiguous or creative pleading. A plaintiff cannot revive the last-treatment rule by merely pleading that the defendant had an on-going or continuing duty to act throughout the duration of the patient-physician relationship or by simply pleading that his or her physician continued to adhere to a mistaken diagnosis or treatment plan throughout the duration of the patient-physician relationship.

3. Under the proper facts, continued adherence to a particular diagnosis or treatment plan might constitute a discrete negligent act or omission for purposes of determining the accrual date. A plaintiff must plead facts that are sufficient to place the defendant physician on notice of the specific acts or omissions that the plaintiff believes caused his or her injuries. Depending on the complexity of the acts or omissions at issue, this may require the plaintiff to identify with some degree of specificity how the physician breached the standard of care. In the context of a physician's continued adherence to an initial diagnosis or treatment plan after the abrogation of the last-treatment rule, it is

insufficient to merely allege that the defendant breached the standard of care by continuing to adhere to the original diagnosis or treatment plan. To establish that continued adherence to an initial diagnosis or treatment plan constitutes a discrete act or omission after the date when the initial diagnosis or plan was adopted, the plaintiff must plead and be able to prove facts that would establish that the continued adherence at the later point constituted a breach of the duty owed to the plaintiff. A physician is not immunized from liability by simply adhering to a mistaken diagnosis or treatment plan at all subsequent appointments. Rather, a physician must act within the standard of care on each visit, and a physician's continued adherence to a particular diagnosis or treatment plan at a later appointment might constitute a breach of the standard of care if there are facts that show that continued adherence was unreasonable. Moreover, if the continued adherence to the diagnosis or treatment plan constitutes a breach of the standard of care, the plaintiff may seek redress for the harms caused by that breach as a separate claim, even if the initial adoption of the diagnosis or treatment plan was itself outside the limitations period. In other words, the plaintiff can plead and prove that his or her physician's failure to correct the initial diagnosis or treatment plan constituted a breach of the standard of care that was distinct from the initial adoption of the diagnosis or treatment plan.

4. In her complaint, Kincaid referred to several generic acts and omissions that she alleged caused her injury. She did not, however, provide any details about the acts or omissions that would relate the acts or omissions to her specific course of treatment. She also did not identify any specific dates for a particular act or omission, but described these failings as occurring in the months leading up to her amputation on July 21, 2008. In her NOI, Kincaid stated the same generic assertions, but she also identified specific tests that Cardwell should have performed, the point at which he allegedly failed to properly diagnose her, and the point at which he should have warned her that he was not qualified to treat her and failed to refer her to someone who was qualified. When Kincaid's complaint was read in light of her NOI, the discrete acts or omissions that served as the basis for her malpractice claims all occurred before June 1, 2008. Her general allegations that at all times Cardwell had failed in certain regards could not save her claims because they did not allege discrete acts or omissions that occurred on specific dates after his first treatment on April 25, 2008. In the absence of more specific allegations or evidence, all later acts and omissions involving the failure to inform, refer, and treat were simply part of Cardwell's continuing

course of treatment, and Kincaid could not rely on that continuing treatment alone to establish later accrual dates. While Kincaid's NOI provided some additional details concerning the specific acts or omissions that supported her claims, it was clear that each act or omission had occurred before June 1, 2008. Thus, because Kincaid's claims were untimely on the face of her pleadings, *Cardwell and St. Clair Cardiovascular* initially established that they were entitled to summary disposition, and the burden shifted to Kincaid to show that there was at the very least a question of fact about whether her claims were timely. She failed to present evidence to establish a question of fact about whether Cardwell committed an act or omission on or after June 1, 2008, and the trial court did not err by granting Cardwell and St. Clair Cardiovascular summary disposition.

Affirmed.

NEGLIGENCE — MEDICAL MALPRACTICE — LAST-TREATMENT RULE — BREACH OF PHYSICIAN'S DUTY — CONTINUED ADHERENCE TO INITIAL DIAGNOSIS OR TREATMENT PLAN.

A medical malpractice claim accrues at the time of the act or omission that is the basis for the claim; a plaintiff cannot merely plead that the defendant physician had an on-going or continuing duty to act throughout the duration of the patient-physician relationship or that the defendant continued to adhere to a mistaken diagnosis or treatment plan throughout the duration of that relationship; to establish that continued adherence to an initial diagnosis or treatment plan constituted a discrete act or omission after the date when the initial diagnosis or plan was adopted, the plaintiff must plead and be able to prove facts that would establish that the continued adherence at the later point constituted a breach of the duty owed to the plaintiff that was distinct from the initial adoption of the diagnosis or treatment plan; a physician is not immunized from liability by simply adhering to a mistaken diagnosis or treatment plan at all subsequent appointments, but must act within the standard of care on each visit, and a physician's continued adherence to a particular diagnosis or treatment plan at a later appointment may constitute a breach of the standard of care if there are facts that show that continued adherence was unreasonable; if the continued adherence to the diagnosis or treatment plan constitutes a breach of the standard of care, the plaintiff may seek redress for the harms caused by that breach as a separate claim, even if the initial adoption of the diagnosis or treatment plan was itself outside the limitations period (MCL 600.5838a[1]).

*Fieger, Fieger, Kenney, Giroux & Danzig P.C.* (by *Geoffrey N. Fieger* and *Sima G. Patel*) for Brenda Kincaid.

*Plunkett Cooney* (by *Robert G Kamenec* and *Josephine A. DeLorenzo*) for Robert Cardwell, M.D., and St. Clair Cardiovascular Surgeons, P.L.C.

Before: FITZGERALD, P.J., and METER and M. J. KELLY, JJ.

M. J. KELLY, J. In this medical malpractice suit, plaintiff Brenda Kincaid appeals by right the trial court's order dismissing her suit against defendants Robert J. Cardwell, M.D., and his practice, St. Clair Cardiovascular Surgeons, P.L.C., on the grounds that her suit was untimely. On appeal, we conclude that Kincaid failed to rebut the evidence that her claims were untimely. For that reason, we affirm.

### I. BASIC FACTS

On March 17, 2008, Kincaid dropped a piece of lumber while working and injured her left foot. She went to the hospital, but x-rays did not reveal any fractures. She then saw Anca Rusu-Lenghel, M.D., for pain in her foot on April 7, 2008, and was referred to a podiatrist, Laura LaMar, D.P.M.[1]

Kincaid saw LaMar on April 23, 2008, with complaints of "numbness, burning, and pain" in her left foot since the original injury. Kincaid's foot had some discoloration and blisters at the time. LaMar referred

---

[1] We have derived the facts relating to Kincaid's doctor's visits from her medical records, which she attached to her brief in response to the motion for summary disposition.

Kincaid to Vernon Dencklau, D.O., but Kincaid ended up seeing one of Dencklau's partners, Cardwell.

Kincaid saw Cardwell for the first time on April 25, 2008. Cardwell examined Kincaid's foot and leg and noted that her "left great toe is discolored, tender, and has some edema." He wrote that her "two smallest toes of the left [foot] have darkened areas, which are moderately firm." Cardwell diagnosed Kincaid as having "traumatic foot injury, which has had poor healing likely secondary to compromised blood flow to her left lower extremity." Kincaid had a lower extremity Doppler study on the same visit, and the study was "consistent with potentially severe arterial occlusive disease of the left lower extremity . . . ." Cardwell also ordered a magnetic resonance angiogram (MRA) on Kincaid's aorta and lower extremities.

Kincaid had the MRA on April 28, 2008. The MRA revealed some occlusion in Kincaid's "left anterior tibial artery" and some narrowing of the "proximal posterior tibial arteries bilaterally," but did not otherwise reveal significant "flow limiting stenosis" in the "lower extremity runoff."

Cardwell examined Kincaid again on May 7, 2008. He noted a "persistent discoloration of her left great toe and two smallest toes." He also discussed the MRA results with Kincaid and stated that there were mild signs of arterial disease in Kincaid's "left posterior tibial" artery and "moderate to possibly severe" signs of disease in the "anterior tibial artery." However, he noted that there was still good blood flow to her foot at the time. He instructed her to quit smoking and to return in two weeks.

Kincaid returned to Cardwell on June 6, 2008, with reports of severe pain. Cardwell performed a second Doppler study, which showed mild "diminished [blood]

flow to [Kincaid's] left ankle area" and that her "anterior tibial artery [was] occluded on the left." He prescribed Keflex and Percocet and asked Kincaid to return for a follow-up.

Cardwell saw Kincaid again on June 16, 2008. He noted that she had "worsening discomfort and discoloration of her left fourth and fifth toes" and stated that it might be necessary to consider amputation because "there is nothing to revascularize" the foot.

Kincaid next saw Cardwell on July 9, 2008. At that time, Cardwell observed that Kincaid had gangrene in her great and fourth toes. He then referred her to Sadiq Hussain, M.D., for consideration of a left fourth toe amputation. Dencklau, who worked with Hussain, saw Kincaid on July 17, 2008, and determined that she had no bypassable vessels with which to revascularize her foot. As such, he recommended amputation. Dencklau amputated Kincaid's left leg below the knee on July 21, 2008.

Kincaid sued LaMar; LaMar's practice, Hodor and Frascone D.P.M., P.C.; Cardwell; and Cardwell's practice, St. Clair Cardiovascular Surgeons, P.L.C., on November 20, 2010, for malpractice. In her complaint, Kincaid alleged that for "several months leading up to the amputation," defendants breached the applicable standards of care by failing to timely evaluate and treat Kincaid's conditions, failing to refer her to other physicians, failing to warn about the risks, failing to perform appropriate tests, failing to follow up, failing to notify Kincaid's other physicians that they "were not competent or qualified to treat" Kincaid, and failing to otherwise act reasonably.

Kincaid filed an amended complaint with substantially the same allegations in March 2011. However, she only named Cardwell and St. Clair Cardiovascular as

defendants. The circuit court clerk entered an order in July 2011 dismissing Kincaid's claims against Lamar and Hodor and Frascone for failure to serve them.

Kincaid died from lung cancer on October 23, 2011.

On January 3, 2012, Cardwell and St. Clair Cardiovascular moved for summary disposition under MCR 2.116(C)(7). Relying on Kincaid's original notice of intent to sue, which Kincaid had sent on April 5, 2010, Cardwell and St. Clair Cardiovascular argued that Kincaid's claim accrued on either April 25 or May 7, 2008. With the tolling period provided during the notice period, see MCL 600.2912b; MCL 600.5856(c), they maintained that Kincaid had—at the latest—until October 25, 2010, to file her complaint. Because Kincaid did not file her complaint until November 30, 2010, they asserted, it was untimely. Accordingly, they asked the trial court to dismiss Kincaid's complaint with prejudice.

In response to the motion for summary disposition, Kincaid noted that she had not alleged any specific dates in her complaint for Cardwell's breach of the standard of care; rather, she had generally alleged that defendants had breached the standard of care for "several months leading up to the below-the-knee amputation . . . ." Kincaid argued that the evidence showed that Cardwell had breached the standard of care—through undisclosed acts and omissions—on three appointment dates: June 6, June 16, and July 9, 2008. Using June 6, 2008, as the accrual date, Kincaid concluded that her suit was timely. She explained that she had two years from the accrual date to sue, which would be June 6, 2010. See MCL 600.5805(6). However, because the period of limitations was tolled for 182 days after she filed her notice of intent to sue on April 5, 2010, see MCL 600.5856(c), she had until December 7, 2010, to sue.

Cardwell and St. Clair Cardiovascular replied to Kincaid's response on February 24, 2012. They argued that Kincaid was, in effect, relying on the doctrine of continuing wrongs and the last treatment rule, which had been abolished in Michigan. Because the record showed that Kincaid's claims concerned breaches that initially occurred on April 25, 2008, they maintained that the court must use that date as the accrual date.

The trial court held a hearing on Cardwell and St. Clair Cardiovascular's motion on March 5, 2012. At the hearing, Kincaid's lawyer again argued that there were multiple accrual dates because each time Kincaid appeared for an appointment or treatment she had a worsened condition: "It was not the same diagnosis that was being given on each presentment." The trial court determined that, on the basis of the claims stated in her notice of intent to sue, Kincaid's malpractice claim accrued on April 25, 2008. Consequently, it agreed that Kincaid's suit was untimely.

The trial court entered an order dismissing Kincaid's claims under MCR 2.116(C)(7) on March 15, 2012. After the trial court denied Kincaid's motion for reconsideration on April 13, 2012, Kincaid appealed in this Court.

## II. SUMMARY DISPOSITION

### A. STANDARD OF REVIEW

On appeal, Kincaid argues that the trial court erred when it determined that her medical malpractice claim accrued solely on April 25, 2008. Specifically, she contends that she adequately alleged discrete acts and omissions that occurred on each day of treatment. Since she sued within the period of limitations applicable to the breaches of the standard of care that occurred on the last two days of treatment, she maintains that her

suit was timely. This Court reviews de novo a trial court's decision on a motion for summary disposition. *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 369; 775 NW2d 618 (2009). This Court also reviews de novo whether the trial court correctly selected, interpreted, and applied the relevant statutes. *Gay v Select Specialty Hosp*, 295 Mich App 284, 291-292; 813 NW2d 354 (2012).

### B. MCR 2.116(C)(7)

Summary disposition under MCR 2.116(C)(7) is appropriate when the undisputed facts establish that the plaintiff's claim is barred under the applicable statute of limitations. See *Wade v Dep't of Corrections*, 439 Mich 158, 162; 483 NW2d 26 (1992). Generally, the burden is on the defendant who relies on a statute of limitations defense to prove facts that bring the case within the statute. *Tumey v Detroit*, 316 Mich 400, 410; 25 NW2d 571 (1947). In determining whether a plaintiff's claim is barred because of immunity granted by law, the reviewing court will accept the allegations stated in the plaintiff's complaint as true unless contradicted by documentary evidence. *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). Although generally not required to do so, see MCR 2.116(G)(3), a party moving for summary disposition under MCR 2.116(C)(7) may support the motion with affidavits, depositions, admissions, or other admissible documentary evidence, which the reviewing court must consider, *Maiden*, 461 Mich at 119, citing MCR 2.116(G)(5). The reviewing court must view the pleadings and supporting evidence in the light most favorable to the nonmoving party to determine whether the undisputed facts show that the moving party has immunity. *Tryc v Mich Veterans' Facility*, 451 Mich 129, 134; 545 NW2d 642

(1996). If there is no factual dispute, whether a plaintiff's claim is barred under the applicable statute of limitations is a matter of law for the court to determine. *Zwiers v Growney*, 286 Mich App 38, 42; 778 NW2d 81 (2009). However, if the parties present evidence that establishes a question of fact concerning whether the defendant is entitled to immunity as a matter of law, summary disposition is inappropriate. *Id*. In those cases, the factual dispute must be submitted to the jury. See *Tumey*, 316 Mich at 411.

### C. THE PERIOD OF LIMITATIONS

A person cannot sue another "to recover damages for injuries to persons or property unless, after the claim first accrued to the plaintiff . . . , the action is commenced within the periods of time prescribed" by statute. MCL 600.5805(1). The period applicable to medical malpractice is two years from the accrual date. MCL 600.5805(6). Kincaid sued to recover for her injuries on November 30, 2010. In order for her suit to have been timely, her claim would have had to have accrued not earlier than November 30, 2008, unless tolled.

Kincaid could not sue without first giving Cardwell and St. Clair Cardiovascular notice of her intent to do so "not less than 182 days before the action is commenced." MCL 600.2912b(1). In order to ensure that a plaintiff receives the full benefit of the applicable period, the Legislature provided that the period of limitations is tolled for the 182-day notice period, but only if the plaintiff gave the notice before the expiration of the period of limitations. See MCL 600.5856(c); *Driver v Naini*, 490 Mich 239, 249; 802 NW2d 311 (2011). It is undisputed that the earliest accrual date applicable to Kincaid's suit against Cardwell and St. Clair Cardiovascular was April 25, 2008, and that she gave her notice to

sue within two years of that date. As such, she was entitled to the full 182 days of tolling under MCL 600.5856(c). Consequently, if her medical malpractice claim accrued on or after June 1, 2008, which is two years and 182 days before the date she filed her complaint, her claim would be timely. If, however, it accrued before that date, it would be barred under MCL 600.5805(1).

### 1. THE LAST TREATMENT RULE

Originally, the Legislature did not provide an accrual point for medical malpractice claims. See *Morgan v Taylor*, 434 Mich 180, 187; 451 NW2d 852 (1990). Instead, courts applied the common-law "last treatment rule" to determine when a plaintiff's medical malpractice claim accrued. *Id.*, citing *De Haan v Winter*, 258 Mich 293; 241 NW 923 (1932). Under the common-law rule, the period of limitations would only begin to run after there was a break in the patient-physician relationship: " 'The essence of the last treatment rule is that the cessation of the ongoing patient-physician relationship marks the point where the statute of limitations begins to run.' " *Morgan*, 434 Mich at 188, quoting *Heisler v Rogers*, 113 Mich App 630, 633; 318 NW2d 503 (1982). The rationale was that while the physician is treating the patient, the patient reasonably relies on the physician and is under no duty to inquire into the effectiveness of the physician's measures. *Morgan*, 434 Mich at 187-188. The Legislature codified the rule at MCL 600.5838, as enacted by 1961 PA 236. See *Morgan*, 434 Mich at 189 n 14.[2]

---

[2] The Court in *Morgan* ultimately concluded that the legislative version of the last-treatment rule was more expansive than the common-law version because it referred to the date the professional discontinued

In 1986, the Legislature abrogated the last-treatment rule for medical malpractice claims. See 1986 PA 178. For all medical malpractice claims arising after October 1, 1986, the accrual date was no longer determined on the basis of the last day that the physician treated the plaintiff—it was determined on the basis of the act or omission that occasioned the harm: "For purposes of this act, a claim based on the medical malpractice of a person or entity . . . accrues at the time of the act or omission that is the basis for the claim of medical malpractice . . . ." MCL 600.5838a(1).

Although the Legislature determined that the last-treatment rule should no longer govern the accrual of medical malpractice claims, it did not replace the last-treatment rule with a first-treatment rule; rather, the accrual date depends on the date of the specific act or omission that the plaintiff claims caused his or her injury. Similarly, while the Legislature referred to "the act or omission" that is the basis for "the claim," MCL 600.5838a(1), the Legislature did not limit a plaintiff to asserting a single claim for medical malpractice for any given injury. Because a plaintiff's injury can be causally related to multiple acts or omissions, it is possible for the plaintiff to allege multiple claims of malpractice premised on discrete acts or omissions—even when those acts or omissions lead to a single injury—and those claims will have independent accrual dates determined by the date of the specific act or omission at issue. See, e.g., *Brackins v Olympia, Inc*, 316 Mich 275, 279-280; 25 NW2d 197 (1946) (noting that there can be more than one proximate cause for the same injury). However, as this Court explained in *McKiney v Clayman*, 237 Mich App 198; 602 NW2d 612 (1999), the fact

treating or " 'otherwise serving' " the patient. See *Morgan*, 434 Mich at 193. But that holding has no application to the facts of this case.

that a plaintiff may be able to plead multiple accrual dates does not mean that the plaintiff may resurrect the last-treatment rule through ambiguous or creative pleading.

## 2. McKINEY

In *McKiney*, the plaintiff, Susan McKiney, sought treatment from Dr. Lewis Clayman, who was a medical doctor and dentist, for lesions on her tongue in 1989. Clayman removed a cancerous growth from McKiney's tongue in June of that same year. Thereafter, McKiney went to Clayman for recurring spots on her tongue. Clayman opined that the spots were not cancerous and used laser treatments to remove them in 1990, 1992, and 1993. *McKiney*, 237 Mich App at 199.

On December 2, 1993, different doctors tentatively diagnosed McKiney's spots as cancer, and she related that information to Clayman at an appointment on the next day. Clayman continued to state his belief that the spots were not cancerous. McKiney did not return to Clayman for treatment, but did speak with him on the phone several times from January to March 1994 about possible treatments. A biopsy in March 1994 revealed that McKiney had cancer, and McKiney sued Clayman for malpractice on December 21, 1995. *Id.* at 199-200. After the trial court dismissed her claim as untimely under MCR 2.116(C)(7), McKiney appealed.

On appeal in this Court, McKiney argued that her claim was timely because she had continued to receive treatment advice from Clayman by telephone through March 3, 1994. *Id.* at 201. In examining her argument, this Court explained that the date that Clayman last treated McKiney was irrelevant because the Legislature had clearly rejected "the notion that the existence of a continuing physician-patient relationship by itself

could extend the accrual date beyond the specific, allegedly negligent act or omission charged." *Id.* at 203. Instead, the relevant accrual date was the date of the act or omission about which she complained. *Id.*, citing MCL 600.5838a(1).

Turning to the acts and omissions that served as the basis of McKiney's claim, the Court noted that McKiney had essentially alleged that Clayman failed to properly diagnose her cancer and failed to properly treat her by conducting appropriate examinations or referring her to more competent healthcare providers. *McKiney*, 237 Mich App at 202. It explained that she did not identify a specific date on which these failures occurred, but instead merely alleged that the "failures represented ongoing deficiencies that continued until the termination date of the parties' physician-patient relationship" in March 1994. *Id.* Notwithstanding these allegations, the Court concluded that McKiney could not rely on any acts or omissions that Clayman might have made through the December 3, 1993 appointment because those acts and omissions would have occurred more than two years before McKiney sued on December 21, 1995.

The Court in *McKiney* conceded that each treatment date through the visit on December 3, 1993, could—in theory—have served as a separate accrual date, but it is also impliedly held that a physician's mere adherence to an initial misdiagnosis and erroneous treatment plan at later appointments was insufficient by itself to give rise to new accrual dates. *Id.* at 204. Although the Court assumed that Clayman's diagnoses and treatments in 1990, 1992, and 1993 "constituted separate acts or omissions that would represent new accrual dates," it clarified that the record did not actually support the conclusion that the treatments were "new, distinct, and

separate acts or omissions" because McKiney's own testimony showed that Clayman merely "adhered to the same diagnosis and treatment determinations" that he had previously made. *Id.* at 204 & n 4. Similarly, the Court held that McKiney's telephone conversations with Clayman through March 3, 1994, did not establish an accrual date in March 1994 because the record evidence again showed that Clayman "merely adhered to his original misdiagnosis and treatment determination." *Id.* at 207. The Court stated that it would not resurrect the last-treatment rule by adopting a continuing-wrong or continuing-treatment rule. *Id.* at 208.

Under the decision in *McKiney*, courts cannot permit a plaintiff to revive the last-treatment rule by merely pleading that the defendant had an "on-going" or "continuing" duty to act throughout the duration of the patient-physician relationship. Nevertheless, the Court in that case did not address the nature of the pleadings or proofs that would be adequate to remove the case from one pleading a continuing-wrong theory. Likewise, although the court in *McKiney* held that a plaintiff could not revive the last-treatment rule by simply pleading that his or her physician continued to adhere to a mistaken diagnosis or treatment plan throughout the duration of the patient-physician relationship, it did not foreclose the possibility that continued adherence to a particular diagnosis or treatment plan might, under the facts, constitute a discrete negligent act or omission for purposes of determining the accrual date. Therefore, we shall now turn to the nature of the pleadings and proofs that a plaintiff must allege or support with evidence in order to establish that the physician's adherence to an initial diagnosis or treatment plan constituted a discrete act or omission for purposes of establishing a later accrual date.

### 3. ESTABLISHING THE ACCRUAL DATE

A plaintiff must provide sufficient facts in his or her complaint to give the defendant notice of the claims against which he or she must defend: the plaintiff must provide a "statement of facts, without repetition, on which the pleader relies in stating the cause of action, with the specific allegations necessary reasonably to inform the adverse party of the nature of the claims the adverse part is called on to defend[.]" MCR 2.111(B)(1). Although there is no heightened standard of pleading for medical malpractice claims, cf. MCR 2.112(B)(1), Michigan courts have recognized that the complexity of medical malpractice litigation may require a greater degree of precision in pleading the facts constituting the claim in order to comply with the notice requirements set forth in MCR 2.111(B)(1). See *Dacon v Transue*, 441 Mich 315, 329-333; 490 NW2d 369 (1992); *Taylor v Kent Radiology, PC*, 286 Mich App 490, 507; 780 NW2d 900 (2009); *Martinez v Redford Community Hosp*, 148 Mich App 221, 230; 384 NW2d 134 (1986).

In *Dacon*, our Supreme Court explained the importance of providing the defendant physicians with sufficient notice of the acts or omissions that allegedly caused the plaintiff's injuries. In that case, Walter Dacon, as the next friend of his daughter Ericca Dacon, sued the physicians who had treated Ericca for meningitis when she was nine months old. *Dacon*, 441 Mich at 319-321. On appeal, our Supreme Court determined that the trial court did not err when it refused to allow Dacon to present evidence at trial in support of his theory that the physicians committed malpractice by delaying Ericca's treatment. *Id.* at 327-328. The Court explained that Dacon's complaint did not adequately state such a claim: "plaintiff's allegation that the defendant pediatricians did not provide 'appropriate treat-

ment and/or medication in appropriate dosage and/or duration' does not introduce any issue into the case." *Id.* at 329-330. The allegation did not "refer either specifically or generally to any facts" and "delineate[d] nothing specific about how the pediatricians erred." *Id.* at 330. That is, the allegation did not comply with MCR 2.111(B)(1) because it did not provide reasonable notice regarding any specific act or omission: "By literally alleging everything, this allegation alleges nothing." *Id.*

Thus, a plaintiff must plead facts that are sufficient to place the defendant physician on notice of the specific acts or omissions that the plaintiff believes caused his or her injuries. *Id.* Depending on the complexity of the acts or omissions at issue, this may require the plaintiff to identify with some degree of specificity how the physician breached the standard of care. See *Martinez*, 148 Mich App at 233 ("[I]t is the nature of the cause of action itself which will dictate the degree of specificity required, *i.e.*, the more complex the action, the more specific the averments should be."). In the context of a physician's continued adherence to an initial diagnosis or treatment plan after the abrogation of the last-treatment rule, it is insufficient to merely allege that the defendant breached the standard of care by continuing to adhere to the original diagnosis or treatment plan. See *McKiney*, 237 Mich App at 207. By failing to identify the facts that make the continued adherence unreasonable, see *Dacon*, 441 Mich at 330, the plaintiff reduces the claim to one alleging a continuing wrong, which the plaintiff cannot do, see *McKiney*, 237 Mich App at 207-208. In order to establish that continued adherence to an initial diagnosis or treatment plan constitutes a discrete act or omission on a date after the date when the initial diagnosis or plan was adopted, the plaintiff must plead—and be able to prove— facts that would establish that the continued adherence at

the later point constituted a breach of the duty owed to the plaintiff.

Even if a plaintiff fails to properly plead facts establishing that his or her physician's continued adherence to a diagnosis or treatment plan constituted an applicable act or omission, it must be recalled that a plaintiff may generally cure defective pleadings by amendment before trial. See MCR 2.118(A)(2); *Dacon*, 441 Mich at 333. Because a plaintiff generally has the opportunity to cure defects in his or her pleadings by amendment, it is not necessarily fatal to the plaintiff's case that he or she failed to adequately allege facts establishing that the physician's continued adherence to the diagnosis or treatment plan constituted a discrete act or omission within the period of limitations. Instead, even if the plaintiff's complaint is defective in this regard, the plaintiff may survive a properly supported motion under MCR 2.116(C)(7) by presenting evidence that establishes a question of fact about whether the physician's continued adherence constituted a breach of duty that occurred within the applicable period of limitations, see *Zwiers*, 286 Mich App at 42; *Barnard Mfg*, 285 Mich App at 374, and that, given the evidence and the case's procedural posture, the plaintiff should be entitled to cure the deficiency in the pleadings by amendment under MCR 2.118(A)(2).

With these general principles in mind, we shall now examine Kincaid's complaint and the evidence that she presented in response to Cardwell and St. Clair Cardiovascular's motion for summary disposition.

### D. APPLYING THE LAW

#### 1. THE EVIDENCE IN SUPPORT OF DISMISSAL

In her complaint, Kincaid referred to several generic acts and omissions that she alleged caused her injury;

she alleged that Cardwell and St. Clair Cardiovascular failed to "timely evaluate and treat" her, failed to "refer" her "for appropriate care and treatment," failed to warn her about the severity of her condition, failed to perform tests, failed to follow up with her, failed to notify her that they were not competent to treat her, and failed to otherwise act reasonably. She did not, however, provide any details about the acts or omissions that would relate the acts or omissions to her specific course of treatment. She also did not identify any specific dates for a particular act or omission. Rather, she described these failings as occurring in the "months leading up to [her] amputation on July 21, 2008 . . . ."

Although Kincaid did not allege facts in her complaint that would have allowed Cardwell and St. Clair Cardiovascular to identify the specific date or dates on which Kincaid believed Cardwell breached the standard of care, Cardwell and St. Clair Cardiovascular did not move for a more definite statement or to strike the pleadings. MCR 2.115. Instead, they relied on Kincaid's notice of intent to sue to establish the dates when Kincaid's claim might have accrued. Because her notice was part of her malpractice "process" or "proceeding," see *Bush v Shabahang*, 484 Mich 156, 176-177; 772 NW2d 272 (2009), and constituted other documentary evidence, MCR 2.116(G)(5), the trial court could properly consider it along with Kincaid's complaint in deciding the motion under MCR 2.116(C)(7).

In her notice, Kincaid first stated the same generic assertions that Cardwell and St. Clair Cardiovascular should have timely evaluated and treated her, should have referred her for care and treatment, and should have warned her about the severity of her condition. But she also identified specific tests that Cardwell should have performed, the point at which Cardwell

allegedly failed to properly diagnose her, and the point at which he should have warned her that he was not qualified to treat her and failed to refer her to someone who was qualified:

> No later than April 23 [sic], 2008, Dr. Cardwell was required to perform [a] lower extremity angiography, or refer the patient and make certain that she underwent [a] lower extremity angiography by a competent physician, to identify the site of the occlusion(s), any collateral circulation, possible target vessels for bypass, and visualization of run-off vessels. Dr. Cardwell was also required to conduct duplex studies to assess the caliber and patency of the patient's veins as soon as he could arrange same. Further, Dr. Cardwell was required to recognize the red flags of discoloration of her toes, re-injuries to the toes, numbness, tenderness and pain, on top of the clinical presentation including weak femoral pulses, weak pedal pulses and a hardly detectable pedal pulse on the left. No later than April 25, 2008, as soon as Dr. Cardwell learned that the patient had "potentially severe Arterial Occlusive Disease of the left lower extremity", Dr. Cardwell was required to notify the patient that she needed urgent care and treatment, and that he was not competent or qualified to treat this patient for a severe Arterial Occlusive Disease of the left lower extremity. Further, as of that date, Dr. Cardwell was required to refer the patient for appropriate care and treatment by a competent and qualified vascular or other surgeon before gangrene or ischemic necrosis occurred.[3]

In addition to the claimed acts and omissions on April 25, 2008, Kincaid alleged that Cardwell should have warned her that he was not competent to treat her condition and should have referred her to another physician on May 7, 2008. She also alleged that Card-

---

[3] We have quoted the ninth paragraph of § 2 from Kincaid's notice of intent to sue, which is headed "Applicable Standard of Practice." However, Kincaid used substantially the same language to describe the manner in which Cardwell breached the standard of care and the action that he should have taken to achieve compliance.

well should have informed LaMar that he could not treat Kincaid on May 7, 2008, and should have informed LaMar that Kincaid still had good blood flow to her foot.

Finally, Kincaid alleged that at "all times" Cardwell was required to notify Kincaid and LaMar that he was not competent to treat Kincaid, that an MRA revealed that Kincaid's "left . . . tibial artery" was likely occluded within the mid portion, but the "proximal portion appeared 'widely patent[']', and that the patient was a candidate for a bypass or re-vascularization." Similarly, she alleged that, at "all times," Cardwell was "required to order appropriate wound care and antibiotics for the non-healing ulcers he saw when he first met Plaintiff."

Reading Kincaid's complaint in light of her notice, it appears that the discrete acts or omissions that serve as the basis for her malpractice claims against Cardwell and St. Clair Cardiovascular occurred before June 1, 2008. Each of the dates identified by Kincaid in her notice was before June 1, 2008. Kincaid's notice shows that Cardwell's failure to properly treat and diagnose her began on her first visit to him on April 25, 2008. It was at that point that he should have first realized that he was not competent to treat her condition and should, for that reason, have referred her to a qualified physician. It was also at that point that he should have ordered the specific tests identified in Kincaid's notice. Kincaid also stated that Cardwell should have referred her to another physician and informed her and her treating physicians about his inability to treat her and about his findings to that point on May 7, 2008, which he did not do.

The general allegations that at "all times" Cardwell failed in certain regards cannot save Kincaid's claims. She alleged that Cardwell had failed to inform her that he was not qualified and failed to order proper wound

care at all times. But it was clear from her complaint that his failure to inform her and treat her wound arose on the first day of treatment and that he merely continued with this allegedly erroneous course of treatment. Merely alleging that a physician continued to adhere to a mistaken diagnosis or treatment plan at later appointments is insufficient to establish an independent act or omission on those later appointment dates. *McKiney*, 237 Mich App at 207-208. This is not to say that a physician is immunized from liability by simply adhering to a mistaken diagnosis or treatment plan at all subsequent appointments. Rather, a physician must act within the standard of care on *each* visit, and a physician's continued adherence to a particular diagnosis or treatment plan at a later appointment might constitute a breach of the standard of care if there are facts that show that continued adherence was unreasonable. Moreover, if the continued adherence to the diagnosis or treatment plan constitutes a breach of the standard of care, the plaintiff may seek redress for the harms caused by that breach as a separate claim, even if the initial adoption of the diagnosis or treatment plan was itself outside the period of limitations. In other words, the plaintiff can plead and prove that his or her physician's failure to correct the initial diagnosis or treatment plan constituted a breach of the standard of care that was distinct from the initial adoption of the diagnosis or treatment plan.[4]

---

[4] By way of some nonexhaustive examples, it might have been a breach of the standard of care for Cardwell to continue to adhere to an initial diagnosis or treatment plan in the face of evidence that Kincaid's symptoms had worsened or had not improved as expected under the initial treatment plan or after he received new test results. Similarly, if Cardwell failed to physically examine Kincaid at a subsequent visit and, as a result, did not have information that would have caused a reasonable physician to revise his or her diagnosis and treatment plan, the failure to conduct an examination might also constitute a distinct breach.

Here, however, Kincaid did not allege facts to establish that Cardwell breached the standard of care by continuing to adhere to an original diagnosis or treatment plan. Because Kincaid's allegations, even when viewed in the light most favorable to her, cannot be interpreted as alleging discrete acts or omissions that occurred on specific dates after his first treatment, those general allegations must be understood to refer to acts or omissions that first occurred on April 25, 2008. All later acts and omissions involving the failure to inform, refer, and treat—in the absence of more specific allegations or evidence—are simply part of Cardwell's continuing course of treatment and Kincaid could not rely on Cardwell's continuing treatment alone to establish later accrual dates. *Id.* Finally, Kincaid's allegation that at "all times" Cardwell failed to inform her or her physicians about the fact that an MRA revealed that she was a candidate for bypass also referred to an act or omission that occurred before June 1, 2008. As noted in her notice of intent to sue, Kincaid had the MRA on April 28, 2008, and her next visit with Cardwell was on May 7, 2008. Thus, Cardwell's failure to properly inform Kincaid or her physicians about the MRA arose on or before May 7, 2008.

Kincaid's complaint was so vague about the specific acts constituting malpractice (failing to treat, refer, inform, perform tests, notify, and act reasonably) and the dates that the acts occurred (referring to a period of "several months") that it arguably failed to identify any act or omission by Cardwell with sufficient specificity to permit Cardwell to offer a defense. See *Dacon*, 441 Mich at 329-330.[5] Reading Kincaid's complaint in the light

---

[5] As already noted, Cardwell and St. Clair Cardiovascular did not move to strike the complaint or ask for a more definite statement. See MCR 2.115. Cardwell and St. Clair Cardiovascular similarly failed to plead facts in

most favorable to her, she alleged that Cardwell breached the standard of care on the first day of treatment and that all subsequent treatment was a mere continuation of these allegedly improper acts and omissions; therefore, they could not serve as discrete acts or omissions for purposes of the accrual date. See *McKiney*, 237 Mich App at 207-208.

In contrast to her complaint, Kincaid's notice of intent to sue provided some additional details concerning the specific acts or omissions that supported her claims against Cardwell and St. Clair Cardiovascular. But, as discussed earlier, it is clear that each act or omission had to have occurred before June 1, 2008. Consequently, Cardwell and St. Clair Cardiovascular initially established that they were entitled to summary disposition under MCR 2.116(C)(7). And, as such, the burden shifted to Kincaid to show that there was—at the very least—a question of fact about whether her claims were timely. *Zwiers*, 286 Mich App at 42; *Barnard Mfg*, 285 Mich App at 374.[6]

---

support of their statute of limitations defense; they merely asserted that Kincaid's complaint "may be barred in whole or part by the Statute of Limitations" without pleading any facts that, if left unrebutted, would show that Kincaid's claims were untimely. See MCR 2.111(F)(3); see also *Shank v Woodworth*, 111 Mich 642, 643; 70 NW 140 (1897) (stating that a defendant must plead the facts supporting the defendant's statute of limitations defense or it is waived); *Robinson v Emmet Co Rd Comm*, 72 Mich App 623, 641; 251 NW2d 90 (1976) ("We rule it was incumbent upon the defendant in the instant case to properly raise such a defense by pleading both the appropriate statute and the facts which indicated that the statute was applicable as a special defense which prevented recovery against this defendant."). But Kincaid did not move to strike the defense or otherwise argue that Cardwell and St. Clair Cardiovascular had waived the defense. Therefore, we have limited our analysis accordingly.

[6] Although *Barnard Mfg* concerned the shifting burden applicable to a motion for summary disposition under MCR 2.116(C)(10), we believe that this same analysis applies to factual questions involving a motion for summary disposition under MCR 2.116(C)(7).

2. KINCAID'S RESPONSE

In her reply brief, Kincaid relied in part on the very fact that her complaint was vague: "Plaintiff maintains that Defendants violated the standard of care for treatment provided several months leading up to Plaintiff's July 21, 2008 amputation . . . ." This broad reference to months, Kincaid maintained, must be interpreted in light of her recitation of the facts to conclude that each date of treatment involved separate acts and omissions. Despite attaching her medical records, letters by Cardwell concerning her treatment, and her affidavit of merit, Kincaid did not meaningfully connect the evidence to any act or omission by Cardwell that occurred on or after June 1, 2008. Rather, it was apparently her position that, because Cardwell continued to treat her after June 1, 2008, the court must assume that her allegations applied equally to each treatment date. It was not the trial court's responsibility to sift through the evidence attached to Kincaid's response to determine whether it could identify specific acts or omissions that might give rise to a later accrual date. See *Barnard Mfg*, 285 Mich App at 377-379. Rather, Kincaid had the burden of bringing forth evidence to contradict the evidence presented by Cardwell and St. Clair Cardiovascular to establish a question of fact about whether her claims were timely filed. This she did not do. By failing to identify the specific negligent acts or omissions that occurred during the June 6, June 16, or July 9, 2008, appointments, Kincaid was left relying on Cardwell's continued treatment to establish new accrual dates on each appointment after the first, which she could not do. See *McKiney*, 237 Mich App at 207-208.

Kincaid's lawyer did make a belated effort to correct these deficiencies at oral argument on the summary

disposition motion; it was then that Kincaid's lawyer first alleged that Cardwell's continued adherence to a mistaken diagnosis constituted a breach of the standard of care. Kincaid's lawyer began by distinguishing the facts in *McKiney* from Kincaid's case; she explained that in *McKiney*, the plaintiff did not present any evidence that there were new symptoms that gave rise to a new duty:

> There was nothing new presented. There was no new diagnosis that he was giving. Conversely in our case here each time the -- each time Plaintiff presented to the Doctor's officer she was showing a worsening symptom. So the first time she presented, yes, she had discoloration of the -- in her toes and they had did [sic] all these tests, et cetera. The next time she presented she had further discoloration of the toes. They were doing the femoral pulses. One time she had [a] femoral pulse in the left leg. Next time they had the femoral pulse but there was no pedal/push action. Then you keep going to June 6th and then June 16th she's worsening in her discomfort. She's worsening in her presentment. She's getting gangrene in the toes and still the Defendant, the Defendant Doctor did not refer her out and did not -- failed to diagnose that she had a serious problem with her foot.

In reviewing a motion for summary disposition, this Court must determine whether the trial court erred on the basis of the arguments and evidence properly presented to the trial court. *Barnard Mfg*, 285 Mich App at 380-381. Although Kincaid's brief continued to assert claims that amounted to a continuing wrong, she could have remedied that defect at oral arguments by showing that there was evidence that established a discrete negligent act or omission on a later date. See *id*. at 380 (noting that the parties may bring to the trial court's attention evidence that is contained in the record in their briefs or *orally* at the motion hearing). And Kincaid's lawyer tried to do just that; she argued that

Cardwell committed an act or omission giving rise to liability by adhering to his initial diagnosis or treatment plan despite evidence that Kincaid's condition had worsened. The evidence that Kincaid's condition was progressively worsening, she maintained, gave rise to an independent duty to reevaluate his diagnosis and presumably adopt new treatments for Kincaid's condition or to refer Kincaid to another physician. However, Kincaid's lawyer only generally referred to the record evidence; she did not identify specific pieces of evidence that showed that Kincaid's condition had worsened and did not identify the evidence that showed that a physician in Cardwell's position would have revised his or her diagnosis or treatment plan in light of Kincaid's condition on the later appointment dates. In the absence of such evidence, Kincaid was left with her claim that Cardwell breached the standard of care by continuing to adhere to his initial diagnosis and treatment plan; however, Cardwell's continued adherence was by itself insufficient to establish a question of fact about whether he committed an act or omission on or after June 1, 2008. *McKiney*, 237 Mich App at 207-208.

### III. CONCLUSION

Kincaid did not allege facts in her pleadings that adequately placed Cardwell and St. Clair Cardiovascular on notice of any acts or omissions that occurred on or after June 1, 2008, that might have given rise to liability. As such, her claims were untimely on the face of her pleadings. Moreover, in response to Cardwell and St. Clair Cardiovascular's properly supported motion for summary disposition under MCR 2.116(C)(7), Kincaid failed to present evidence to establish a question of fact about whether Cardwell committed an act or omission on or after June 1, 2008. Therefore, the trial

court did not err when it concluded that, under the undisputed facts, Kincaid's claims were untimely and should be dismissed under MCR 2.116(C)(7).

Affirmed. As the prevailing parties, Cardwell and St. Clair Cardiovascular may tax their costs. MCR 7.219(A).

FITZGERALD, P.J., and METER, J., concurred with M. J. KELLY, JJ.