*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF EDWARD SZEKELY, by DEBRA
L. SZEKELY, Personal Representative,

          Plaintiff-Appellant,

v

NIKOLAI KINACHTCHOUK, M.D. &
LIOUDMILA KINACHTCHOUK, M.D., PLC,
NIKOLAI KINACHTCHOUK, M.D., JENNIFER
RADEWAHN, PA-C, NAVEED AKHTAR, M.D.,
and MICHIGAN CARDIOVASCULAR
INSTITUTE, PC,

          Defendants-Appellees.

UNPUBLISHED
October 22, 2019

No. 344377
Saginaw Circuit Court
LC No. 16-031841-NH

Before: REDFORD, P.J., and JANSEN and LETICA, JJ.

PER CURIAM.

After Edward Szekely's (Edward) death from cardiac tamponade, his estate filed a medical-malpractice action against Nikolai Kinachtchouk, M.D. (Edward's primary-care physician); Jennifer Radewahn (Dr. Kinachtchouk's physician assistant); and Naveed Akhtar, M.D. (a cardiologist consulted by Dr. Kinachtchouk).[1] Plaintiff's estate appeals as of right the trial court's grant of summary disposition to defendants under MCR 2.116(C)(10). We affirm the grant of summary disposition to Dr. Kinachtchouk, Radewahn, and their related corporation. We reverse the grant of summary disposition to Dr. Akhtar and his related corporation and remand this case for further proceedings.

---

[1] The liability of the corporate defendants is entirely dependent on the alleged negligence of Dr. Kinachtchouk, Radewahn, and Dr. Akhtar. As such, we do not refer to the corporate defendants separately.

## I. BACKGROUND

On July 21, 2013, 57-year-old Edward suffered a heart attack and the next day he had an implantable cardioverter defibrillator (ICD) implanted with a lead placed in the right ventricle of his heart to help his heart to function properly. There is no allegation of any negligence regarding the implantation procedure itself. ICD installment carries a known risk that the wire lead inserted in the ventricle may migrate and cause perforation of tissue and effusion of fluid which may collect in the pericardial sac surrounding the heart.

The hospital admitted Edward on August 2, 2013, when he presented complaining of chest pain and shortness of breath. Dr. Akhtar served as the consulting cardiologist during his hospital stay from August 2 through August 4, 2013. About a week after his discharge from the hospital, Edward went to his primary physician's office because of shortness of breath, chest pain, and pain while breathing. He received treatment from Radewahn. A few days later Radewahn called Edward to follow up and noted in his medical records that he was "doing well." Edward continued to have problems but he did not seek further treatment. Edward died on August 18, 2013. An autopsy revealed that he died from cardiac tamponade, the compression of the heart from an accumulation of fluid within the pericardial sac.

Plaintiff alleged that defendants failed to take appropriate medical actions despite Edward's complaints of chest pain and shortness of breath, and despite the fact that a computed tomography angiogram (CTA) performed on Edward during a hospital stay the first week of August 2013 showed mild pericardial effusion, or fluid around the heart. Plaintiff alleged that an ICD lead moved causing symptoms, and his treaters should have detected and repositioned the lead before it led to Edward's death. The trial court concluded that plaintiff failed to present sufficient evidence that defendants could have detected the issue and taken appropriate preventive actions before Edward's death on August 18. The trial court opined that the evidence conclusively established that the perforation and the bleeding around Edward's heart occurred shortly before his death, not on or before the dates of the pertinent treatments by defendants which commenced on August 2, 2013.

## II. STANDARD OF REVIEW AND LEGAL STANDARDS

This Court reviews de novo a trial court's decision regarding a motion for summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). "A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint." *Id*. at 120. A trial court must consider the "affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties . . . in the light most favorable to the party opposing the motion." *Id*. "Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law." *Id*. (citations omitted).

"In a medical malpractice case, plaintiff bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. Failure to prove any one of these elements is fatal." *Wischmeyer v Schanz*, 449 Mich 469, 484; 536 NW2d 760 (1995) (citations omitted). "Expert testimony is required to establish the applicable standard of care and to demonstrate that the defendant breached that standard." *Gonzalez v St John Hosp & Med Ctr*, 275 Mich App 290,

294; 739 NW2d 392 (2007). A plaintiff may establish a genuine issue of material fact on the issue of proximate causation by presenting expert testimony that the defendant's negligence more probably than not proximately caused the plaintiff's injury. *O'Neal v St John Hosp & Med Ctr*, 487 Mich 485, 490; 791 NW2d 853 (2010). "In order to proceed . . . on a theory of vicarious liability, a plaintiff must offer expert testimony to establish specific breaches of the standards of care applicable to the individuals involved in the plaintiff's care and treatment alleged to be deficient." *Gonzalez*, 275 Mich App at 295 (citation omitted). "Circumstantial evidence can be sufficient to establish a genuine issue of material fact, but mere conjecture or speculation is insufficient." *McNeill-Marks v Midmichigan Med Ctr-Gratiot*, 316 Mich App 1, 16; 891 NW2d 528 (2016) (citation omitted). Nevertheless, this Court "is liberal in finding genuine issues of material fact." *Jimkoski v Shupe*, 282 Mich App 1, 5; 763 NW2d 1 (2008). "A court may not make findings of fact; if the evidence before it is conflicting, summary disposition is improper." *Piccione as Next Friend of Piccione v Gillette*, 327 Mich App 16, 19; 932 NW2d 197 (2019) (quotation marks and citation omitted).

III. ANALYSIS

A. DR. AKHTAR

Plaintiff contends that the trial court improperly made findings of fact, assessed the credibility of witnesses, and weighed the evidence concerning whether Dr. Akhtar acted negligently and whether his negligence led to Edward's death. We agree.

The record reflects that Dr. Stanley J. Schneller, plaintiff's cardiology expert, testified that Edward had symptoms of an ICD lead perforation including pleuritic chest pain, shortness of breath, and a pericardial effusion as shown by the CTA performed during his August hospital stay. He opined that a lead had, at that point, begun the process of perforating out of Edward's right ventricle and that when "more lead came out at the end . . . that was associated with sufficient acute bleeding to cause the hemodynamic catastrophe of tamponade." Dr. Schneller pointed out that the images from the CTA that Edward underwent had areas of brightness that prevented one from seeing whether any perforation had occurred. He testified that further testing was needed:

It is my opinion that according to the standard of care, [Dr. Akhtar] would have needed to get an [echocardiogram] and interrogated the [ICD].[2] And further, it is my opinion that had those things been done, the diagnosis of ICD lead perforation, a known complication of this type of surgery, would have been made when the patient had a small pericardial effusion, another operation would have been done, the lead would have been moved back and repositioned, and the

---

[2] An interrogation involves a check of the various functions of the device.

progressive pericardial effusion that ultimately led to tamponade would not have happened.

Given the expert testimony presented, plaintiff adequately raised a genuine issue of material fact regarding whether Dr. Akhtar violated the applicable standard of care and whether this violation resulted in Edward's death. The trial court afforded no weight to Dr. Schneller's testimony, opining that it was conclusively contradicted by the pathologist, Dr. Kanu Virani, who performed the autopsy and concluded that the perforation that caused the fatal bleed occurred within minutes or hours of Edward's death. The trial court further opined that Dr. Jeffrey E. Saffitz, an autopsy pathologist, agreed with Dr. Virani's statement, and that Dr. Schneller and Dr. Saffitz, both plaintiff's witnesses, therefore, gave inconsistent testimony. Close analysis of the record, however, contravenes that conclusion. When viewed under the correct standard in the light most favorable to plaintiff as required, a reasonable trier of fact could conclude the testimony of Dr. Schneller and Dr. Saffitz are not, in fact, inconsistent. Dr. Saffitz testified that "the perforation . . . that led to the bleed, which caused the cardiac tamponade and death" occurred shortly before Edward's death. Dr. Saffitz clarified, however, that he believed that the chest pain and shortness of breath that Edward had been experiencing earlier in August that caused him to go to the hospital on August 2 related to the ICD tip having obtained some "access to the epicardial tissues of the right ventricle" without "necessarily puncturing and going all the way through." He said that this would elicit a painful inflammatory response and added:

> I'm quite confident that the chest pain that [Edward] was complaining of that brought him . . . to the hospital . . . on the 2nd of August of 2013, when they documented on an imaging study a mild pericardial effusion, in my mind, *this is all explained by the tip of that ICD lead gaining access to that region of the surface of the right ventricle.* [Emphasis added.]

Dr. Saffitz testified, therefore, that evidence presented an alternative factual scenario that conflicted with Dr. Varani's conclusion that Edward suffered a distinct perforation temporally bound to moments, or at most hours before his death. Dr. Saffitz's testimony supported a progressively worsening condition that later presented as a puncture. Dr. Schneller testified similarly and clarified:

> What I believe, just to make it very clear, because it's an important point: I'm defining perforation differently than [Dr. Saffitz] is. He's not thinking about a coil sticking out of the epicardium scratching the pericardium[3] . . . . [H]is opinion, I think is based on . . . *a larger piece of lead sticking out of the ventricle.* But I'm . . . defining perforation as once that coil penetrates the epicardium, that's perforation. So I actually think that there's less disagreement than there seems,

---

[3] A witness defined the "pericardium" as the lining that covers the heart. The "epicardium" is "the innermost layer of the pericardium." *Random House Webster's College Dictionary* (1997).

because I believe I'm defining perforation differently than a pathologist is defining perforation. [Emphasis added.]

Dr. Schneller explained:

[T]hat coil worked its way, with time, through the endocardium and poked through the epicardial surface, the outer surface of the right ventricle, where it does not belong. Once that happens, that is called perforation. That's a perforation. That does not mean that the entire lead is through, such as we saw in the autopsy. But once the coil has perforated the heart, that is called perforation of a lead.

Dr. Schneller defined "perforation" as occurring not solely when the ventricle ultimately became fully punctured but also when it began migrating through the pericardium or, in Dr. Saffitz's words, "gaining access to that region of the surface of the right ventricle." Dr. Virani, like Dr. Saffitz, averred that the "perforation", or puncture, occurred shortly before death, but again, Dr. Schneller adequately explained that he defined perforation differently from how the pathologists defined the term. The record reflects that Dr. Schneller and Dr. Saffitz presented testimony based upon record evidence that, when viewed in favor of plaintiff, established a genuine issue of material fact regarding the condition Edward experienced that caused him to seek treatment on August 2, its severity, cause, and whether medical investigation would have revealed the necessity for intervention. The trial court, however, failed to view the evidence in the light most favorable to plaintiff as required. *Maiden*, 461 Mich at 120.

Defendants claim that Dr. Schneller only speculated about whether the migration of the lead could have been detected before the fatal cardiac tamponade. The record, however, reflects that Dr. Schneller testified that a chest x-ray is generally used to look for malposition of a device lead, but he later clarified that an echocardiogram and device interrogation would have led to the diagnosis of a perforation caused by the lead and that appropriate treatment could have been rendered. Dr. Akhtar did not order such investigative procedures.

Defendants argue further that Dr. Schneller admitted that if a lead is fully within the heart, device-interrogation numbers might be uninformative. Dr. Schneller, however, stated that interrogation numbers would be different "once the lead pokes through into the pericardium," and he opined that the lead, by August 2, had in fact poked partially into or "scratched" the pericardium and then *eventually* achieved the larger perforation.

We conclude that, when viewed in the light most favorable to plaintiff, the evidence presented by plaintiff in this case established a genuine issue of material fact regarding medical malpractice by Dr. Akhtar. The record establishes that Dr. Schneller based his expert opinions on record evidence and the conflict between the parties' experts regarding the facts underpinning their opinions should have been left to the fact-finder to decide. Accordingly, the trial court erred by granting Dr. Akhtar summary disposition.

Defendants argue that the evidence did not conform to the allegations in the complaint.[4] We disagree. In the complaint, plaintiff alleged numerous ways in which Dr. Akhtar breached the standard of care including, among other things, failing to investigate Edward's pericardial effusion, perform an echocardiogram, and conduct a device interrogation. The complaint alleged further that, because of Dr. Akhtar's negligence, "ongoing bleeding around [Edward's] heart, due to a pacemaker lead perforation, continued to increase over time resulting in pressure on and around his heart, leading to his death from cardiac tamponade on Sunday, August 18th of 2013."

The following exchange occurred during Dr. Schneller's deposition:

> *Q.* So if [the pathologist] is of the opinion that there was no blood in the pericardium related to the lead prior to August 18, you would disagree with that because you believe it was in there on August 2, true?

> *A.* I would say I don't agree or disagree. I would say there's no pathologic evidence. So either there was insufficient blood to satisfy whatever the pathological criteria are for making that diagnosis, or there was perforation without bleeding, and that perforation without bleeding resulted in the ultimate tamponade later. But the perforation itself must have occurred earlier.

Defendant contends that insufficient evidence of ongoing bleeding existed and that, therefore, the claim as framed by plaintiff's complaint lacked evidentiary support. However, while the complaint alleged ongoing bleeding around Edward's heart, it also alleged that Dr. Akhtar failed to diagnose a right ventricular perforation following the placement of his pacemaker and that the perforation resulted in pressure around his heart. In his affidavit of merit pursuant to MCL 600.2912d(1), Dr. Schneller stated that Dr. Akhtar failed "[t]o timely diagnose a right ventricular perforation following placement of a pacemaker[.]" He stated that "[Edward's] pericardial effusion went untreated, worsening with time, resulting in his death."

Even if Edward's symptoms were caused by pericardial effusion involving general inflammation and some unspecified exuded fluid, as opposed to bleeding, plaintiff's pleadings adequately informed Dr. Akhtar of the nature of the claims against him. See *Kincaid v Cardwell*, 300 Mich App 513, 529; 834 NW2d 122 (2013). We conclude that plaintiff alleged with sufficient specificity Dr. Akhtar's failure to investigate and diagnose a perforation of whatever degree that caused a pericardial effusion and that it eventually progressed to cardiac tamponade and death. We find that the pleadings, including Dr. Schneller's affidavit of merit, adequately informed Dr. Akhtar of the allegation that a perforation from an ICD lead had been causing worsening problems and a cardiac effusion of some type and that the lead perforation ultimately led to the cardiac tamponade. The evidence presented by plaintiff in opposition to Dr. Akhtar's motion for summary disposition supported plaintiff's claim sufficient to establish genuine issues of material fact for trial.

---

[4] Plaintiff attempted to amend the complaint but the trial court denied the motion, and plaintiff does not challenge this denial on appeal.

Defendants also contend that plaintiff based its causation theory on speculation because Edward resisted obtaining treatment and no evidence established that he would have submitted to treatment had it been recommended. Defendants assert that Edward lied to Radewahn during a telephone call on August 15 about feeling "good" and they also rely on testimony that Edward did not follow the advice of his son, then a third-year medical student, to go to the emergency room. This argument pertains to the allocation of damages under MCL 600.6304's comparative fault regime and these facts do not negate plaintiff's causation theory as a matter of law. Plaintiff alleged that Dr. Akhtar's negligence proximately caused Edward's postsurgical condition to go untreated despite the presence of symptoms, enabled them to worsen, and ultimately lead to his death.

Moreover, the record reflects that Edward's wife testified that he tried to lose weight and took prescribed medications, and his son testified that he planned to get further medical care which does not unequivocally establish that he neglected his own health. Further, Edward's son testified that he declined to go to the emergency room on the Friday before his death because his doctors had told him that he was fine. Even if Edward falsely told Radewahn on August 15 that he was "good," such evidence does not definitively prove that if the appropriate medical providers had told him on August 2, 3, 4, or 12 that he was at risk of death, he would have ignored their recommendations about treatment. To the extent that Dr. Akhtar may present evidence that Edward displayed reluctance or refused to seek and accept further testing and treatment, the fact-finder at trial will determine whether and to what extent Dr. Akhtar committed negligence that proximately caused Edward injury and whether Edward bore comparative fault for such injury because of his own conduct. See generally, *Shinholster v Annapolis Hosp*, 471 Mich 540; 685 NW2d 275 (2004).

## B. DR. KINACHTCHOUK

In setting forth the allegations of negligence against Dr. Kinachtchouk, the complaint and affidavit of merit focused on an August 12, 2013 office visit or the period immediately thereafter. Evidence established that only Radewahn, and not Dr. Kinachtchouk, saw Edward during that office visit. Further, the expert witness offered against Dr. Kinachtchouk admitted that he had no criticisms of Dr. Kinachtchouk beyond the August 2 to August 4 hospital stay because Dr. Kinachtchouk had no further involvement with Edward after that stay. Contrary to plaintiff's argument on appeal, plaintiff's pleadings did not give Dr. Kinachtchouk notice that his "acts or omissions" during Edward's hospital stay allegedly caused injury. *Kincaid*, 300 Mich App at 529. Accordingly, the trial court properly granted Dr. Kinachtchouk summary disposition.

## C. RADEWAHN

Plaintiff's claim of error respecting the trial court's grant of summary disposition for Radewahn lacks merit. De novo review of the record reflects that Radewahn treated Edward on August 12, 2013, when he presented with complaints of lightheadedness, nausea, and shortness of breath during this appointment. Upon examination, she determined that he had low blood pressure and she recommended that he cut back on his blood pressure medication. Based on his description of symptoms, she also told him to take an antacid. The record indicates that Radewahn followed up with Edward three days later and contacted him by phone. During their

conversation, Edward told her that he was "good." Radewahn relied on Edwards positive report. The record does not indicate that anyone advised Radewahn that Edwards lied to her or otherwise misrepresented his condition at the time she made the follow-up call. On appeal, plaintiff fails to establish how Radewahn breached the applicable standard of care by relying on Edwards positive report of his condition that indicated the treatment he received from Radewahn had a positive effect. Radewahn could reasonably rely on his self-assessment. Accordingly, the trial court did not err by granting Radewahn summary disposition.

## IV. CONCLUSION

We affirm the trial court's grant of summary disposition for Dr. Kinachtchouk, Radewahn, and their associated professional liability corporation. We reverse the grant of summary disposition for Dr. Akhtar and his associated professional corporation and remand this case for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ James Robert Redford
/s/ Kathleen Jansen
/s/ Anica Letica