# STATE OF MICHIGAN

# COURT OF APPEALS

---

GARY GOLDBERG,

        Plaintiff-Appellant,

v

FIRST HOLDING MANAGEMENT COMPANY,
BAY MANOR, DOUGLAS SILLS, CLAUDIA
SILLS, SUSAN J. SILLS, and NINETY SIX BAY
MANOR,

        Defendants,

and

88 WOODS, LLC, BRIGHTON GLENNS, LLC,
FIRST HOLDING MANAGER, LLC, and
NINETY SIX MB, LLC,

        Defendants-Appellees.

UNPUBLISHED
June 21, 2016

No. 325960
Oakland Circuit Court
LC No. 2011-120459-CB

---

Before: JANSEN, P.J., and O'CONNELL and RIORDAN, JJ.

PER CURIAM.

Plaintiff appeals as of right the opinion and order of the trial court dismissing his claims following the bench trial in the case. We affirm.

This case arises from the management of LLCs in which plaintiff had a membership interest.[1] Following a bench trial, the trial court found in favor of defendants and dismissed the complaint. Plaintiff appealed to this Court, and this Court determined that the trial court's findings of fact and conclusions of law were insufficient for this Court to review. *Goldberg v First Holding Mgt Co*, unpublished opinion per curiam of the Court of Appeals, issued October 9, 2014 (Docket No. 314874). This Court remanded the case to the trial court in order for the

---

[1] For a discussion of the relevant facts of the case, see *Goldberg v First Holding Mgt Co*, unpublished opinion per curiam of the Court of Appeals, issued October 9, 2014 (Docket No. 314874), pp 1-2.

-1-

trial court to delineate the issues that were properly raised for trial, and analyze and rule on the issues. *Id*. at 7. This Court also instructed the trial court to expand upon its reasoning for why it failed to qualify plaintiff's witness, Paul Ghraib, as an expert in property management. *Id*. The trial court entered a revised opinion and order delineating the issues raised for trial, explaining the reasons why it refused to qualify Ghraib as an expert in property management, and analyzing both the issues raised for trial and the issues that were not raised for trial.

Plaintiff first argues that the trial court erred when it concluded that the sale of the property owned by defendant 88 Woods (88 Woods) did not violate the operating agreement or substantially interfere with the interests of the members. We disagree.

We review for clear error a trial court's findings of fact and review de novo a trial court's conclusions of law in a bench trial. *Waisanen v Superior Twp*, 305 Mich App 719, 723; 854 NW2d 213 (2014). "A finding is clearly erroneous if, after a review of the record, this Court is left with a definite and firm conviction that a mistake was made." *Fette v Peters Constr Co*, 310 Mich App 535, 549; 871 NW2d 877 (2015). We review for an abuse of discretion a trial court's decision regarding the meaning and scope of a pleading. *Weymers v Khera*, 454 Mich 639, 654; 563 NW2d 647 (1997). " 'There are circumstances where a trial court must decide a matter and there will be no single correct outcome; rather, there may be more than one reasonable and principled outcome. The trial court abuses its discretion when its decision falls outside this range of principled outcomes.' " *Kincaid v Flint*, 311 Mich App 76, 94; 874 NW2d 193 (2015) (citation omitted).

We first conclude that the trial court properly delineated the issues raised for trial. MCR 2.111(B)(1) provides that a complaint must contain "[a] statement of the facts, without repetition, on which the pleader relies in stating the cause of action, with the specific allegations necessary reasonably to inform the adverse party of the nature of the claims the adverse party is called on to defend[.]" MCR 2.111(B)(1), therefore, requires that the complaint provide the defendant with sufficient facts to give notice of the claims against which the defendant must defend. See *Kincaid v Cardwell*, 300 Mich App 513, 529; 834 NW2d 122 (2013). MCR 2.118(C) provides:

> (1) When issues not raised by the pleadings are tried by express or implied consent of the parties, they are treated as if they had been raised by the pleadings. In that case, amendment of the pleadings to conform to the evidence and to raise those issues may be made on motion of a party at any time, even after judgment.

> (2) If evidence is objected to at trial on the ground that it is not within the issues raised by the pleadings, amendment to conform to that proof shall not be allowed unless the party seeking to amend satisfies the court that the amendment and the admission of the evidence would not prejudice the objecting party in maintaining his or her action or defense on the merits. The court may grant an adjournment to enable the objecting party to meet the evidence.

Plaintiff challenges on appeal the trial court's decision with regard to (1) the purchase of the mortgage on the property owned by 88 Woods, (2) the sale of the property owned by 88 Woods, (3) the loans that the Sills family made to the LLCs, and (4) the delegation of property management duties to sub-managers. This Court noted in the prior opinion in this case that the

-2-

second amended complaint did not mention the loans, the hiring of the sub-managers, or the purchase of the mortgage. *Goldberg*, unpub op at 4. However, this Court remanded the case to the trial court in order for the court to determine the issues properly raised at trial and to analyze the issues. *Id*. at 7.

The trial court concluded that plaintiff failed to plead the claims related to the purchase of the 88 Woods mortgage, the Sills family loans, and the sub-managers. Additionally, the court concluded that defendants did not explicitly or impliedly consent to a constructive amendment of the complaint to include the claims. The allegations of member oppression in the complaint were limited to claims that defendants engaged in conduct that was willfully unfair and oppressive to the LLCs and their members when they took the following actions: (1) paying money to members or managers for maintenance, repair, and other services that were unnecessary, unperformed, or performed on properties that were not affiliated with the LLCs, (2) paying for personal items without a legitimate business purpose, (3) preventing plaintiff from being involved in the LLCs, which included denying plaintiff access to information including copies of the actual bills for services allegedly performed for the benefit of the LLCs, and, with regard to 88 Woods, "the appraisal of the assets of 88 Woods, LLC, for purposes of determining the adequacy of the consideration for the purchase and sale agreement executed by the members selling all of the assets of 88 Woods, LLC," and (4) failing to pay distributions since 2004. Plaintiff also alleged

> [t]hat defendant, First Holding Manager, LLC, caused a certain purchase and sale agreement of all of the assets of 88 Woods, LLC to be sold together with the assets of one or more LLCs which closing on said purchase and sale agreement occurred on or about the month of August, 2010. It is the sale and activities leading up to the sale that plaintiff maintains were conducted and/or performed by those managers and members in control of the limited liability company in a willfully unfair and oppressive manner toward the limited liability company and its members in general and plaintiff in particular.

Thus, plaintiff alleged that the sale of the property owned by 88 Woods constituted oppression. However, plaintiff did not plead the issues relating to the mortgage purchase, the Sills's loans, or the hiring of sub-managers. See MCR 2.118(C).

In addition, the court correctly concluded that plaintiff did not move under MCR 2.118(C) to cure the defect, and defendants did not expressly or impliedly consent to a constructive amendment of the complaint to include these claims. Instead, the record establishes that defendants objected to plaintiff raising claims during the proceedings that were not raised in his complaint. For example, the parties listed in the stipulated final pretrial order the question "[w]hether plaintiff may assert unpleaded claims with regard to 88 Woods mortgage purchase, the right to pay management fees or whether operating costs could have been lower[.]" Furthermore, defendant's attorney challenged in his opening statement and closing statement plaintiff's failure to plead a claim regarding the purchase of the mortgage on the property owned by 88 Woods, the loans by the Sills family, and the management fees.

Contrary to plaintiff's argument, his additional claims regarding the Sills family loans, the delegation of duties to sub-managers, and the purchase of the mortgage loan did not

-3-

constitute additional information regarding his pleaded claims. Instead, plaintiff argued claims that were not alleged in his complaint. Plaintiff points out that he introduced evidence on the issue of the loans, the mortgage purchase, and the sub-managers, and defendants also introduced evidence relating to these issues. Although defendants presented evidence relating to the subject matter of plaintiff's additional claims, defendants nevertheless objected to plaintiff's attempts to assert additional claims that were not in his complaint. Therefore, the trial court properly concluded that plaintiff did not raise for trial the issues of the Sills family loans, the sub-managers, and the purchase of the 88 Woods mortgage, and the court properly determined that defendants did not expressly or impliedly agree to the inclusion of the issues at trial.

Plaintiff argues that the court erred in determining that the sale of Westland Woods, the property owned by 88 Woods, constituted member oppression. The trial court concluded that the sale of the property did not violate the operating agreement because the Sills family held a majority interest in 88 Woods at the time of the closing on the property, and the operating agreement provides that majority consent of the members is required to convey or transfer property. Thus, the court concluded that the operating agreement authorized the sale because a majority of the members of the LLC approved of the sale at the time of closing.

MCL 450.4515(1) provides, in part:

A member of a limited liability company may bring an action in the circuit court of the county in which the limited liability company's principal place of business or registered office is located to establish that acts of the managers or members in control of the limited liability company are illegal or fraudulent or constitute willfully unfair and oppressive conduct toward the limited liability company or the member.

MCL 450.4515(2) defines willfully unfair and oppressive conduct as

a continuing course of conduct or a significant action or series of actions that substantially interferes with the interests of the member as a member. Willfully unfair and oppressive conduct may include the termination of employment or limitations on employment benefits to the extent that the actions interfere with distributions or other member interests disproportionately as to the affected member. The term does not include conduct or actions that are permitted by the articles of organization, an operating agreement, another agreement to which the member is a party, or a consistently applied written company policy or procedure.

Plaintiff argues that the trial court erred in determining that the sale of the property owned by 88 Woods did not constitute oppression because the sale violated 88 Woods's operating agreement. Section 6.01(b) of the 88 Woods operating agreement provides that the sale of all or any portion of the property owned by 88 Woods requires the unanimous vote of the managers of the company. First Holding Manager, LLC (FH Manager) was named as the sole manager of 88 Woods. Section 6.02 provides, in part:

(a) Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, at any time prior to

the obligations secured by the Mortgage have been paid in full, the Company shall not, without the majority consent of Members, do any of the following:

* * *

(iii) dissolve or liquidate the Company;

(iv) consolidate or merge with or into any other entity or convey or transfer or lease its property and assets substantially as an entirety to any entity[.]

The sale of the property did not violate § 6.02 because the majority of the members of the LLC consented to the sale at the time of closing. Plaintiff argues that the property was conveyed or transferred at the time that the parties to the sale entered into the purchase agreement, while defendants contend that the property was not conveyed or transferred until the closing. The operating agreement does not define the terms "convey" or "transfer." "Unless otherwise defined, contractual language is given its plain and ordinary meaning." *Cole v Auto-Owners Ins Co*, 272 Mich App 50, 53; 723 NW2d 922 (2006). We may refer to a dictionary to determine the ordinary meaning of a term. *Id*. The *Merriam-Webster's Collegiate Dictionary* (11th ed) defines the term "convey," in relevant part, as "to transfer or deliver (as property) to another esp. by a sealed writing." The term "transfer" is defined, in relevant part, as "a conveyance of right, title, or interest in real or personal property from one person to another," and "removal or acquisition of property by mere delivery with intent to transfer title." In this case, the dictionary definitions indicate that the terms "convey" and "transfer" refer to the transfer of the title or the interest in the property.

Plaintiff points out that the purchase agreement was signed on April 30, 2009, which was before the Sills family gained a majority interest in 88 Woods and purchased the mortgage note. At the time that the contract was signed, the Sills family owned less than a majority interest in the property. However, the Sills family owned 52% of the LLC at the time of the conveyance of the property in 2011. The Sills gained a majority interest because most of the members of the LLC redeemed their interest in order to reduce their tax obligation in the event that the property sold. John Breza, an employee of First Holding Management Company (First Holding Management Co), testified that the Sills family had the right to convey or sell the property because the Sills owned a majority of the interest in 88 Woods at the time of closing. The transfer of the property did not violate § 6.02 of the operating agreement because the Sills owned a majority interest in 88 Woods at the time that the title to the property was transferred. Therefore, the sale of the property owned by 88 Woods did not constitute willfully unfair and oppressive conduct because it was permitted by the operating agreement. See MCL 450.4515(2).

Furthermore, even assuming that defendants' actions violated the operating agreement, the sale of the property did not constitute oppression. Defendants presented evidence that the property was worth less than the other two properties included in the sale, and the property was sold for more than its market value. This is because a tax credit purchaser purchased the property, and a tax credit purchaser is an entity that receives tax credits from the government and sells the tax credits in return for equity in a project that does not depend on a financial return. The tax credit purchaser also has a smaller real estate tax obligation. This permits the tax credit purchaser to pay more than a conventional purchaser will pay for property.

The properties were purchased for approximately $20,000 per unit. However, Westland Woods was valued at only $14,000 per unit. Thus, the property was purchased for more than its market value. Plaintiff points out that the purchaser bought the property owned by 88 Woods along with two properties owned by an LLC in which the Sills family are members and for which FH Manager was the manager. However, Breza explained that the purchaser refused to purchase any of the properties without purchasing all three properties together. Furthermore, the other properties were valued at $18,000 to $19,000 per unit. The sale of the property did not constitute a continuing course of conduct or a significant action or series of actions that substantially interfered with the interests of the members because the property was purchased for more than its market value. The evidence indicates that defendants acted to the benefit of the LLC by engaging in a sale of the property for more than its market value during an economic decline in the real estate market. See MCL 450.4515(2).

Plaintiff next contends that the trial court erred when it failed to find that the loans from the Sills family gave rise to member oppression. We disagree.

The trial court concluded that the issue of the loans was not raised as an issue for trial. Nevertheless, the court concluded that, although the operating agreements were ambiguous regarding whether unsecured loans were permissible, the loans that the Sills family made to the LLCs did not constitute oppression because plaintiff failed to show damages. Instead, the evidence established that the loans "saved these businesses from collapse and seriously reduced loss exposure to the companies' members." The court also concluded that the majority of the loans were permitted under the operating agreements because they constituted tenant improvements.

We agree with the trial court that the issue was not properly raised for trial. However, even assuming that the issue was raised for trial, the fact that the Sills family loaned money to the LLCs did not constitute willfully unfair and oppressive conduct. First, plaintiff's claim for damages is barred by the applicable limitations period. MCL 450.4515(1)(e) provides, in part, "An action seeking an award of damages must be commenced within 3 years after the cause of action under this section has accrued or within 2 years after the member discovers or reasonably should have discovered the cause of action under this section, whichever occurs first." Plaintiff testified that he knew that the Sills family was making loans to 88 Woods three or four years before filing the complaint. With regard to defendant 96, MB, LLC (96, MB) and defendant Brighton Glenns, LLC (Brighton Glenns), plaintiff testified that he learned about the loans sometime in 2008 or 2009. Although plaintiff may not have known about all of the loans two years before the complaint was filed in July 2011, plaintiff knew that the Sills family was making loans to at least one LLC more than two years before he filed the complaint. Thus, plaintiff's claim for damages is time-barred because he discovered the cause of action regarding the loans more than two years before filing the complaint. See MCL 450.4515(1)(e).

Furthermore, plaintiff failed to establish member oppression. Section 6.01(b) provides that "incurring 'long term (more than three (3) years) indebtedness' secured by Company assets, on behalf of the Company" requires a unanimous vote of the Managers. Section 6.02 provides, in part:

-6-

(a) Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, at any time prior to the obligations secured by the Mortgage have been paid in full, the Company shall not, without the majority consent of Members, do any of the following:

* * *

(ii) incur any indebtedness or assume or guaranty any indebtedness not the Company's[.]

Section 8.01(c) originally provided:

With the consent of the Majority of the Members, any Member may loan money to, act as surety for, or transact other business with the Company, and subject to applicable law, shall have the same rights and obligations with respect thereto as a person who is not a Member, but no such transaction shall be deemed to constitute a Capital Contribution to the Company and shall not increase the Capital Account of any person engaging in any such transaction.

However, Breza testified that the first amendment to the operating agreements amended § 8.01(c) to provide:

"Notwithstanding the foregoing or anything else in this agreement if the company needs funds for *tenant improvements*, lease commissions, or other similar costs, any member *with the consent of the manager* can loan such funds to the company." [Emphasis added.]

Breza testified that the money that the Sills family loaned to 88 Woods was for tenant improvements, commissions, and related costs. The loans were typically less than the costs of tenant improvements, commissions, and similar costs. Breza explained that the money was typically for maintenance to ensure that the apartments were operational and functional. He explained that with regard to the properties owned by the LLCs, the LLCs did not have enough money to improve apartment units, maintain the property, and repair units after tenants moved out. This testimony established that the loans went toward tenant improvements, commissions, or other similar costs. Therefore, the trial court did not err in concluding that the loans were authorized under the first amendments to the operating agreements of the LLCs. Accordingly, plaintiff failed to establish willfully unfair and oppressive conduct toward the LLCs or plaintiff. See MCL 450.4515(1) and (2).

Regardless, plaintiff fails to show that the loans caused him to incur damages or that FH Manager's conduct was willfully unfair and oppressive. Plaintiff contends that the companies "became so indebted to the Sills that FHM operated by John Breza controlled the LLC for the benefit of the [S]ills." Plaintiff asserts that the loans "assured (in the case of 88 Woods, LLC) that no member would receive any proceeds from the sale of that asset," and prevented the members from having the opportunity to determine if the loans were necessary, how the money should be used, and whether a capital call or another method for obtaining money should be used. However, Breza testified that the LLCs could not obtain loans through any traditional

lender. He explained that "there was zero market for unsecured loans behind first mortgages that were underwater that were at risk of foreclosure." He further explained that FH Manager did not request a capital call because

> we thought that the property was worth something maybe even less than the debt, and we didn't think it would be appropriate to go to the partners for a capital call. It's sort of been the Sills' policy, and it was Archie Sills' way from when he started to sort of protect his investors a little bit and to not go to them for capital because these people typically don't have the money, you know, they don't -- you know, asking somebody for more money on an investment doesn't create happy investors, so he generally shielded them from capital calls and put the money in himself.

Breza testified that if the Sills family had not made the loans, then "[t]he property would have gone into default and very likely would have been lost in foreclosure." Therefore, the trial court correctly determined that the loans saved the companies from financial collapse. In addition, plaintiff's argument regarding the alternatives to the loans was speculative, at best. Plaintiff cannot show that he incurred any damages from the loans, and, indeed, the loans prevented the members of the LLCs from incurring financial loss. Therefore, plaintiff failed to establish that the loans constituted member oppression. See MCL 450.4515.

Plaintiff next argues that the purchase of the mortgage on the property owned by 88 Woods by the Sills family constituted oppression. We disagree.

We agree with the trial court that the issue was not properly raised for trial. Regardless, we conclude that the purchase of the mortgage note did not constitute member oppression. First, the claim is time barred. Plaintiff found out about the mortgage purchase in a June 1, 2009 letter, which stated that an entity named Westland Woods Funding, LLC, owned by members of the Sills family, had purchased the mortgage. The letter offered the members the opportunity to participate in the loan purchase. Plaintiff's argument stems from Westland Woods Funding, LLC's purchase of the loan with FH Manager's participation. Plaintiff did not file the lawsuit until July 18, 2011, which was over two years after plaintiff reasonably should have discovered the cause of action through the June 1, 2009 letter. Thus, plaintiff filed the lawsuit over two years after he reasonably should have discovered a cause of action. See MCL 450.4515(1)(e).

However, even assuming that plaintiff properly pleaded the issue and that his claim was not barred by the applicable limitations period, the mortgage purchase did not constitute member oppression because the mortgage purchase did not violate the operating agreement, and more importantly, the mortgage purchase was financially advantageous and appears to have been the only way to avoid foreclosure. Furthermore, plaintiff and the other members of 88 Woods were provided with the opportunity to participate in the purchase. In 2007, 88 Woods entered into a purchase agreement to sell Westland Woods, its only asset, to a tax credit purchaser. However, in mid-2008, the contract expired and the tax credit purchaser elected not to go through with the sale. In the fall of 2008, Breza was able to reinstate the purchase contract with the tax credit purchaser. However, by early 2009, the purchase contract expired again. The mortgage on the property matured on April 1, 2009. Breza discussed refinancing with the mortgage holder and several other mortgage brokers. On April 16, 2009, Douglas Sills sent a letter to the members of

88 Woods indicating that the only course of action was to permit the lender to foreclose on the loan. The letter noted that the loan balance was $1,010,000, and stated that the Sills family had loaned the property over $500,000 "to cover operating shortfalls and improvements to the property." The letter explained that the value of the property was substantially lower than the loan amount and that, in spite of efforts to negotiate an extension of the loan, foreclosure was imminent. The letter explained that foreclosure would allow for a six-month redemption period in which to sell the property and that while a sale was possible, it was "highly unlikely but still worth pursuing."

However, FH Manager and the Sills family learned that the lender was willing to sell a discounted mortgage note sometime between April 16, 2009, and the May 28, 2009 purchase date. Breza testified that he negotiated the purchase of the mortgage on behalf of the Sills family, rather than on behalf of the LLC. Breza explained that the lender changed its mind about permitting a purchase of the mortgage when it realized that the property would sell for a lot less than the lender expected. However, the lender stated that the purchase of the mortgage had to be immediate. Breza explained that the lender stated, "[Y]ou have a week to pay us or -- to buy this, or offer's off the table." Thus, there was no time to discuss the issue with the members before making the decision.

Douglas Sills sent a letter to the members of 88 Woods after the Sills family purchased the loan, informing the members of 88 Woods that they could participate in the mortgage purchase. The letter stated that the mortgage note was purchased by Westland Woods Funding, LLC, an entity owned by members of the Sills family, for $675,000. The property was worth approximately $500,000. The original loan was currently worth approximately $1,000,000. Breza explained that the purchase was risky because it was unclear whether the loan was worth $675,000. If the sale of the property went through, then the purchasers stood to earn money, but if the sale did not go through, the purchasers would lose money. Breza recounted that the letter stated:

> "We've been able to enter into a purchase agreement with the same tax credit purchase that I've been working on for the past two years. The purchaser, an affiliate of Schwartz Bradley, believes that the Obama recovery legislation will make tax credits and financing more available, and therefore they've made application with the State of Michigan. In the event that they get the credits, they obtain HUD financing, they sell the tax credits, they raise their equity, we believe that they will close and we hope that it takes six to nine months, and that we determined that it was necessary to purchase the note in order to give that sale a chance."

Breza believed that the chance of sale of the property was less than "50-50."

The letter offered for any member of the LLC to participate in the mortgage purchase. Breza explained that this was because Westland Woods Funding stood to gain money on the closing. The letter directed the members to call Breza on the telephone if interested in participating. The letter indicated that an additional $150,000 would be required in funding during the due diligence period of the purchase agreement, but that, at closing, the loan would be paid based on the terms of the original loan, which was worth about $1,000,000. The letter

-9-

explained that the money would go toward repaying the loans that were made to fund the First Holding entities, and any remaining funds would be distributed to the members. Thus, plaintiff was given the opportunity to participate in the mortgage purchase. He chose not to participate. He testified at trial that this was because he did not understand what was going on with the transaction and there was no oversight of the transaction. In an August 20, 2010 letter, FH Manager offered the members the opportunity to redeem their interest in the LLC in order to avoid tax liability in the event that the property sold. Plaintiff did not redeem his interest.

Plaintiff fails to establish that defendants engaged in a continuing course of conduct or significant action or series of actions that substantially interfered with the interests of plaintiff as a member. Instead, the evidence indicates that defendants took actions to minimize financial loss and prevent foreclosure on the mortgage. If the sale did not go through immediately, the evidence indicates that the next step would have been foreclosure of the property. Furthermore, it was unclear at the time of the mortgage purchase that the sale of the property would occur, which would mean that the purchaser of the mortgage would lose money after purchasing a loan for more than the market value of the property. The members of 88 Woods were given the opportunity to participate in the mortgage purchase, and, therefore, were not excluded from benefitting from the loan purchase. Additionally, plaintiff fails to establish damages since the mortgage purchase saved the property from foreclosure. Accordingly, the trial court did not err when it concluded that plaintiff failed to establish an oppression claim with regard to the mortgage note purchase. See MCL 450.4515(1) and (2).

Plaintiff next argues that the trial court erred when it concluded that the delegation of property management duties to sub-managers did not violate the operating agreement or constitute oppression. We disagree.

The issue is deemed abandoned on appeal because plaintiff failed to state the issue in his statement of the questions presented. See MCR 7.212(C)(5); *Mettler Walloon, LLC v Melrose Twp*, 281 Mich App 184, 221; 761 NW2d 293 (2008). However, even assuming that the issue were not abandoned, the delegation of property management duties to sub-managers did not constitute oppression. Section 6.12 of each operating agreement provides, "Except for the reimbursement of any expenditures made on behalf of the Company, no Manager shall be entitled to receive any salary or other compensation for the services rendered in its capacity as Manager on behalf of the Company." Section 6.15 was amended to name FH Manager as the manager of the LLCs. It provides, "Notwithstanding anything contained in the Agreement to the contrary there shall be only one Manager of the Company. The Manager of the Company shall be First Holding Manager LLC ("FHM"). FHM may not be removed as the Manager of the Company without the consent of all Members." The second amendment to the operating agreements also provides that the LLCs may enter into a *property management and leasing* agreement with First Holding Management Co. Breza explained that FH Manger managed the LLC, while First Holding Management Co managed the real estate, "which involve[d] overseeing the collection of rent, the maintenance . . . the capital care of the business, the production of the accounting and the records, and management of the employees."

Each LLC subsequently contracted with First Holding Management Co for management services, including asset management and property management services. The contracts provided that First Holding Management Co would receive 5% or 6% of gross rents. First

Holding Management Co then contracted with third-party management companies to handle the day-to-day management functions for the properties. First Holding Management Co continued to handle the asset management functions. Breza explained that First Holding Management Co delegated "onsite property management responsibilities" duties to sub-managers so that First Holding Management Co "could sort of focus on this calamity that was going on around us and really handle sort of more of the asset management level work." Breza explained the difference between property management and asset management as follows:

> Property management typically can be broken down into sort of two levels, there's sort of an asset level, asset management level, and then sort of like a property day-to-day property management level. And the asset management level typically involves handling of refinancing, acquisitions and dispositions, it handles capital improvement projects, all expenses in excess of $5,000 typically falls into the category of asset management. Sort of really anything that doesn't involve day-to-day operations of the property such as rent collections and, you know, maintenance issues.

The sub-managers were paid 3.5% of gross rents out of the 5% or 6% paid to First Holding Management Co. Breza explained:

> [W]e took a portion of the fee that was being paid to First Holding Management Company, and since we only subbed out a portion of sort of our overall management responsibility we determined an appropriate allocation for allowing - - or hiring this third-party management company to handle some of that day-to-day, and that amount was the 3 ½ percent that you mentioned.

The agreement between First Holding Management Co and the LLCs did not contain a section distinguishing between asset management and property management. However, Breza testified that First Holding Management Co continued to handle refinancing projects. First Holding Management Co continued to oversee "dispositions, capital improvements, [and] any expense over $5,000." First Holding Management Co managed

> expenditures over $5,000, we have intimate involvement in the bidding process, visiting the property, we go to these properties, you know, multiple times in the month, we have monthly meetings, we review every single income statement, we review every single expenditure, we review the general ledgers, we have substantial and significant involvement in the operation of the property.

Breza testified that he worked to refinance the loan on Bay Manor, LLC, for approximately 300 hours over the course of a year. Breza also worked approximately 500 hours to refinance the mortgage for Brighton Glenns. He succeeded in refinancing both mortgages.

The delegation of day-to-day property management functions to sub-managers did not constitute member oppression. Plaintiff essentially contends that First Holding Management Co did not have the authority to delegate management functions to sub-managers, and the operating agreements did not authorize payment to a manager. However, First Holding Management Co was not named as a defendant in plaintiff's second amended complaint. FH Manager did not

-11-

delegate its duties to sub-managers. Instead, the parties signed a second amendment to the operating agreements permitting the LLCs to contract with First Holding Management Co for property management and leasing, and First Holding Management Co is the entity that hired sub-managers.

Regardless, each operating agreement permitted the LLCs to hire First Holding Management Co, and no provision in the operating agreements prohibited First Holding Management Co from hiring sub-managers. Furthermore, there was testimony that First Holding Management Co earned the up to 2.5% fee it retained. Breza testified that First Holding Management Co engaged in asset management. Breza outlined the asset management activities in which First Holding Management Co participated. He testified that he personally spent hundreds of hours on asset management. The delegation of some property management duties to sub-managers did not constitute a continuing course of conduct or a significant action that substantially interfered with the interest of plaintiff as a member considering that the LLCs were still charged 5% or 6% of the gross rents regardless of how the money was divided between First Holding Management Co and the sub-managers. Plaintiff does not challenge whether the 5% or 6% fees were reasonable market rates for property management. Therefore, the trial court did not err in determining that the delegation of some management duties to sub-managers was not oppression because there was testimony that First Holding Management Co retained management responsibilities that entitled it to a fee. See MCL 450.4515(1) and (2).

Finally, we note that plaintiff does not explicitly challenge the trial court's remaining conclusions with regard to several of the specific allegations of oppression that plaintiff pleaded in his complaint. To the extent that plaintiff challenges the trial court's conclusion that plaintiff failed to establish his claims regarding (1) payment for unnecessary or unperformed services, (2) payment for personal items, (3) preventing plaintiff's participation in the LLCs and access to information, and (4) failure to pay distributions, we agree with the trial court that plaintiff failed to show that defendants made payments for unnecessary or unperformed services, or for personal items. As discussed in further detail below, there is no indication that defendants withheld information or prevented plaintiff's participation in the LLCs. In addition, there was ample testimony regarding the effect of the financial downturn on the LLCs, which explains why the LLCs did not make distributions after 2004. Therefore, to the extent that plaintiff raises a challenge with regard to the trial court's conclusions on any of the remaining oppression claims, plaintiff's argument fails.

Plaintiff next argues that the trial court erred when it refused to qualify Ghraib as an expert in property management. We disagree.

We review for an abuse of discretion a trial court's decision regarding the qualifications of an expert witness. *Albro v Drayer*, 303 Mich App 758, 760; 846 NW2d 70 (2014). The proponent of expert testimony has the burden to establish that it is admissible. *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 781; 685 NW2d 391 (2004). MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if

(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data." *Gilbert*, 470 Mich at 782. The expert's opinion must be rationally derived from a sound foundation, but need not be universally accepted or necessarily correct. *Lenawee Co v Wagley*, 301 Mich App 134, 162; 836 NW2d 193 (2013).

The trial court explained in its opinion and order that it declined to qualify Ghraib as an expert in property management because Ghraib testified that he hired others as property managers, Ghraib did not prepare an expert report in property management, and the court found Ghraib's testimony regarding property management incredible. Thus, the trial court "was left with the firm opinion that Mr. Ghraib did not possess the required 'knowledge, skill, experience, training, or education' on property management" to meet the requirements of MRE 702. Instead, the court only found that Ghraib was qualified as an expert in real estate appraisals.

The trial court did not abuse its discretion when it determined that Ghraib did not possess knowledge regarding property management that was rationally derived from a sound foundation. Ghraib testified that he is an active commercial property appraiser. Ghraib became a real estate broker in 1986. Ghraib testified, "I also manage apartments and I manage a small shopping center. I own apartment complex for the last seven years in the City of Westland. And even before I was an appraiser, in the '80s in my capacity as a broker I used to be involved in property management." Ghraib testified that he owns or manages several properties, including apartment complexes, houses, and a small shopping center. Ghraib further testified as follows:

I own and manage 66 -- 66 and one house unit in City of Westland, small (indiscernible) on Warren Avenue in the City of Westland. And I manage also eight units apartment on Redford Township. Then until four months ago, five months ago I was 22 -- 18 or 20 units apartments on Middlebelt between Nine Mile and Ten Mile, Woodview Apartment in Farmington Hills.

He added, "Then I manage houses, we have a property, we have about another five, six houses that we manage in the -- in the office." He explained that he is no longer active as a broker, and instead, mostly works as an appraiser and property manager. However, Ghraib later testified as follows:

*Q.* All right. Let's talk a little bit about property management. Now, you indicated that you actually do property management services?

*A.* Yes.

*Q.* For apartment buildings?

*A.* Yes.

*Q.* And you own apartment buildings?

-13-

*A.* Yes.

*Q.* And do you retain property managers to handle those matters?

*A.* Yes.

Thus, Ghraib's testimony is unclear regarding whether he currently manages any property or used to manage property and currently hires others to do so. Accordingly, the trial court did not abuse its discretion in determining that Ghraib used to manage properties, but currently retains others to handle property management.

Furthermore, assuming that Ghraib did manage properties at the time of trial, the court did not believe that Ghraib was credible. The court pointed out that Ghraib "appeared to stumble through his answer" regarding the standard rate for property management fees "as if picking numbers out of the air." Ghraib testified regarding the management fees as follows: "The property pay all the expenses, the acceptable right now, even based on the (indiscernible) published figure, anywhere between 2 to 5 percent, average about 4 or 3 ½ percents, that's what the acceptable norm. I utilize 4 percent in my -- you know, in my opinion 6 percent[.]" Plaintiff's attorney then asked Ghraib whether he believed 6% was excessive, and Ghraib responded that it was high. Ghraib was unclear regarding the proper rate and did not testify regarding a precise figure. The trial court did not abuse its discretion in determining that Ghraib was incredible considering that the court had the opportunity to observe the demeanor of the witness and evaluate his credibility. Accordingly, the trial court properly excluded Ghraib as an expert in property management.

Plaintiff next argues that the trial court's decision that plaintiff failed to show oppression was against the great weight of the evidence. We disagree.

"[W]e defer to the trial court's findings of fact, which we will affirm unless the evidence clearly preponderates in the opposite direction." *KBD & Assoc, Inc v Great Lakes Foam Technologies, Inc*, 295 Mich App 666, 679; 816 NW2d 464 (2012). MCR 2.611(A)(1) provides, in part:

> A new trial may be granted to all or some of the parties, on all or some of the issues, whenever their substantial rights are materially affected, for any of the following reasons:
>
> * * *
>
> (e) A verdict or decision against the great weight of the evidence or contrary to law.

As discussed above, the evidence established that defendants took actions to protect plaintiff's investments in the LLCs. Plaintiff failed to establish that defendants engaged in willfully unfair and oppressive conduct with regard to the sale of the property owned by 88 Woods, the purchase of the mortgage on 88 Woods, the loans that the Sills family made to the LLCs, or the delegation of management duties to sub-managers. Therefore, the trial court's decision was not against the great weight of the evidence. See *KBD & Assoc*, 295 Mich App at 679.

Plaintiff argues that the trial court erred when it refused to grant his request for an accounting. Plaintiff also argues in connection with this argument that defendants prevented his involvement in the LLCs and access to information. We disagree.

As discussed above, we review for clear error a trial court's findings of fact in a bench trial and review de novo a trial court's conclusions of law in a bench trial. *Waisanen*, 305 Mich App at 723. MCL 450.4503(5) provides that "[a] member may have a formal accounting of a limited liability company's affairs, as provided in an operating agreement or whenever circumstances render it just and reasonable." Plaintiff requested in his complaint that the trial court require the LLCs and FH Manager to "provide an accounting of all payments and distributions made by defendants for and on behalf of" the LLCs over the previous five years, "including the actual invoices for services rendered and products received for or on behalf of" the LLCs. In addition, plaintiff alleged that defendants engaged in business practices that improperly diverted the assets of the LLCs, and, accordingly, a full accounting of the books and records of the LLCs must be made so that plaintiff could "determine whether defendants['] disbursement and distributions of company funds/assets from January, 2004 to the present are legitimate." Plaintiff requested that the court order a full accounting of the books and records of the LLCs, "including all invoices paid, contracts paid, and other evidence of expenses paid as well as all company distributions." Plaintiff explained at trial that he requested copies of checks and invoices.

We first note that the issue is deemed abandoned on appeal because plaintiff failed to state the issue in his statement of the questions presented. See MCR 7.212(C)(5); *Mettler Walloon*, 281 Mich App at 221. Regardless, the trial court properly concluded that the record contradicted plaintiff's assertion that certain information and records were withheld, and plaintiff failed to identify what additional information was not provided to him. Breza testified that plaintiff was provided with any information he sought, including tax returns, and income statements, and defendants' decisions were explained to him. Defendants prepared invoices for plaintiff, but he never picked them up. The basis for plaintiff's accounting claim was that defendants engaged in improper business practices that diverted the assets of the LLCs. Plaintiff failed to establish that defendants engaged in improper business practices or improperly diverted the assets of the LLCs. Rather, as discussed above, defendants took action to save the assets of the LLCs during difficult economic times. Additionally, Joyce Howe, an accountant who worked for the First Holding companies and the Sills, and who used to work for plaintiff, testified that there was no double recordkeeping, diversion of funds, or charging of loans without depositing money into the properties. The evidence indicates that defendants did not withhold information or prevent plaintiff from participating in the LLCs. Therefore, the trial court properly determined that the circumstances did not render an accounting just and reasonable. See MCL 450.4503(5).

Affirmed.

/s/ Kathleen Jansen
/s/ Peter D. O'Connell
/s/ Michael J. Riordan