*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* DECEMBER 23, 2002 RESTATEMENT OF
THE VIVIAN STOLARUK LIVING TRUST.

---

A. SULLIVAN and M. STOLARUK,

        Appellants,

v

JULIUS H. GIARMARCO, Trustee for the STEVE
STOLARUK LIVING TRUST, and SAINT JOSEPH
MERCY OAKLAND,

        Appellees,

and

ATTORNEY GENERAL,

        Other Party.

UNPUBLISHED
April 4, 2024

Nos. 361518; 365004
Oakland Probate Court
LC No. 2019-387099-TV

---

Before: GARRETT, P.J., and RIORDAN and LETICA, JJ.

PER CURIAM.

Petitioners, Ann Marie Sullivan and Marc Stolaruk, are the adult children of Steve and Vivian Stolaruk, who are both deceased. These consolidated appeals arise from Steve's exercise in 2017 of a limited power of appointment (LPA) granted to him by the December 23, 2002 Restatement of the Vivian Stolaruk Living Trust (VSLT), the effect of which deprived petitioners of their distributive shares under the VSLT. In Docket No. 361518, petitioners appeal as of right the probate court's order granting summary disposition in favor of appellee Julius Giarmarco, as trustee of the Steve Stolaruk Living Trust ("Steve's trust"), pursuant to MCR 2.116(C)(7) (statute of limitations), and thereby dismissing petitioners' amended petition for reformation of the VSLT to invalidate the LPA granted to Steve. Petitioners also challenge the probate court's earlier order granting Giarmarco's motions for a protective order and to quash a subpoena. In Docket No.

365004, petitioners appeal as of right the probate court's order, issued following a bench trial, denying petitioners' separate petition for a declaration that Steve exercised the LPA in a manner not permitted by the VSLT. We affirm in both appeals.

## I. FACTS AND PROCEEDINGS

Vivian and Steve Stolaruk each created a revocable trust for the disposition of their assets. On December 23, 2002, Vivian made the final restatement of her trust before her death in March 2003. Vivian named petitioners as beneficiaries and granted them distributive shares of $4,000,000 to Marc and $1,500,000 to Ann Marie. The restatement, which was drafted by Giarmarco, named Steve as successor trustee and granted Steve a LPA that authorized him to appoint assets from Vivian's marital and family trusts to Vivian's descendants, spouses of her descendants, and charitable organizations. This final version of the VSLT became irrevocable upon Vivian's death in March 2003.

According to petitioners, they did not realize that the LPA gave Steve the power to disinherit them from the VSLT and transfer their expectant shares to appellee, St. Joseph Mercy Oakland ("SJMO"). Petitioners allege that Giarmarco prepared flow charts that showed them how the VSLT assets would be distributed after Steve's death, but did not indicate that Steve could exercise his LPA to disinherit them. Petitioners allege that they relied on the flow charts and did not further investigate the extent of Steve's power under the LPA.

In 2017, Steve amended his trust. As amended, Steve's trust did not award any assets to petitioners. He transferred assets to several charitable organizations, with SJMO to receive the residue, subject to the condition that SJMO name a patient tower after him and Vivian. He also exercised the LPA from the VSLT by appointing the assets under his control to Giarmarco, as his successor trustee, who was instructed to appoint the assets to SJMO, subject to the same tower-naming condition.

Steve died on February 12, 2018. Petitioners allege that they then learned, for the first time, that they would not receive any distribution from either of their parents' trusts. Petitioners filed a petition against Giarmarco to reform the trust. They alleged that Vivian could not have intended for Steve to have the power to deny them their distributive shares and that the LPA in the VSLT should be reformed to reflect Vivian's intent that petitioners receive the distributions stated in her trust. Giarmarco moved for summary disposition on the ground that petitioners unreasonably delayed challenging the LPA and their petition was barred by the doctrine of laches. He also argued that Steve's trust and SJMO would be unfairly prejudiced by the belated attempt to invalidate the LPA. Giarmarco argued Steve's trust would be prejudiced because Steve did not have the opportunity to amend his trust to effect the goals of his estate plan and SJMO would be prejudiced because it relied on the promise of a multimillion dollar gift from Steve. SJMO supported Giarmarco's motion based on laches, and also filed its own motion asserting that the petition was untimely under MCL 600.5813 and MCL 700.7604. The probate court granted the motions.

In a prior appeal, this Court reversed the probate court's order and remanded the case to the probate court for further proceedings. *In re December 23, 2002 Restatement of the Vivian Stolaruk Living Trust,* unpublished per curiam opinion of the Court of Appeals, issued April 22,

-2-

2021 (Docket No. 352064).  This Court held that summary disposition on the basis of laches was premature because discovery had not been completed and there were "genuine issues of material fact regarding whether and when due diligence required petitioners to examine the VSLT for themselves and what they knew about the scope of the LPAs," and whether Steve was prejudiced by any delay.  *Id*., unpub op at 9-10.  This Court further held that SJMO was not entitled to summary disposition at that time because its interest in the gift was "contingent on the probate court's ultimate disposition of petitioners' petition" and SJMO could not "properly claim a gift where it is not yet clear that Steve could properly give it."  *Id*., unpub op at 10-11.

On remand, Giarmarco moved for summary disposition on the ground that the petition was untimely under MCL 600.5813 and MCL 700.7604.  While the motion was pending, petitioners served interrogatories and requests for production of documents on Giarmarco and SJMO.  In particular, they sought copies of Steve's individual and trust tax returns, and documents related to the pledge of the gift.  Giarmarco moved for a protective order and to quash a subpoena served on his counsel.  The probate court granted these motions, without prejudice to petitioners pursuing the requested discovery in the future upon a proper showing that the requested materials were relevant to disputed issues.  The probate court also granted Giarmarco's motion for summary disposition and dismissed petitioners' amended petition.  Petitioners appeal these orders in Docket No. 361518.

Petitioners thereafter filed a separate petition for declaratory relief, seeking a declaration that Steve exercised the LPA in violation of the terms of the VSLT because the appointment exposed VSLT assets to Steve's creditors and conferred an economic benefit on Steve.  Following a bench trial, the probate court found that petitioners' claims were without merit and dismissed the petition.  Petitioners appeal that order in Docket No. 365004.

## II.  DOCKET NO. 361518

### A.  SUMMARY DISPOSITION

Petitioners argue that the probate court erred by concluding that their 2019 petition was not timely filed under MCL 600.5813 because their claim accrued at the time of Vivian's death in 2003.  We disagree.

A trial court's decision on a motion for summary disposition is reviewed de novo.  *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).  Summary disposition may be granted under MCR 2.116(C)(7) when a claim is barred by the statute of limitations.  A party moving for summary disposition under MCR 2.116(C)(7) may support its motion with documentary evidence, and "[t]he reviewing court must view the pleadings and supporting evidence in the light most favorable to the nonmoving party" to determine whether the claim is barred by the statute of limitations.  *Kincaid v Cardwell*, 300 Mich App 513, 522; 834 NW2d 122 (2013).  "In the absence of disputed facts, whether a cause of action is barred by the applicable statute of limitations is a question of law, which this Court reviews de novo."  *Magee v DaimlerChrysler Corp*, 472 Mich 108, 111; 693 NW2d 166 (2005).

The probate court granted summary disposition pursuant to MCL 600.5813, which provides that "[a]ll other personal actions shall be commenced within 6 years after the claims

accrue and not afterwards unless a different period is stated in the statutes."[1] "Except as otherwise expressly provided, the period of limitations runs from the time the claim accrues." MCL 600.5827. Unless otherwise provided by statute, a claim "accrues at the time the wrong upon which the claim is based was done regardless of the time when damages results." *Id*. Giarmarco argues that petitioners' claim—challenging the validity of the LPA in the VSLT—accrued upon Vivian's death, which is when the LPA granted to Steve became irrevocable. Petitioners contend that their claim accrued upon Steve's death, which is when his exercise of the LPA to their detriment became irrevocable.

Petitioners rely on the definition of "power of appointment" in the Powers of Appointment Act, MCL 556.111 *et seq*. MCL 556.112(c) provides:

> "Power of appointment" means a power created or reserved by a person having property subject to his or her disposition that enables the donee of the power to designate, within any limits that may be prescribed, the transferees of the property or the shares or the interests in which it shall be received. The term power of appointment may include a power of amendment or revocation, but does not include a power of sale or a power of attorney.

"A power of appointment is 'presently' exercisable whenever the creating instrument does not manifest an intent that its exercise shall be solely by will or otherwise postponed." MCL 566.112(*l*). Petitioners emphasize that Steve's LPA choice did not become irrevocable until his death. However, the question whether petitioners' claim accrued either when Steve was granted the LPA, when that grant became irrevocable, or when Steve's use of it to petitioners' detriment became irrevocable, depends on the nature of petitioners' claim.

In *Frank v Linkner*, 500 Mich 133, 151; 894 NW2d 574 (2017), our Supreme Court held that the plaintiffs' claims for shareholder oppression accrued when the defendant engaged in conduct that was actionable under MCL 450.4515, i.e., conduct that substantially interfered with the plaintiffs' interests as shareholder-members. The Court rejected the plaintiffs' argument that the claim did not accrue until the plaintiff members suffered monetary damages. *Id*. at 151-152. The Court explained that this argument "conflates monetary damages with 'harm' " because "the actionable harm for a member-oppression claim under MCL 450.4515 consists of actions taken by the managers that 'substantially interfere with the interests of the member as a member,' and monetary damages constitute just one of many potential remedies for that harm." *Id*. at 152.

In *Marilyn Froling Revocable Living Trust v Bloomfield Hills Country Club*, 283 Mich App 264, 288; 769 NW2d 234 (2009), the plaintiff's trespass and nuisance claims arose from the defendants' conduct of modifying their properties to cause excessive water runoff and flooding

---

[1] Giarmarco also argued that summary disposition was warranted under MCL 700.7604(1), which provides that a proceeding to contest the validity of a trust may be commenced within the earlier of two years after the settlor's death, or six months after the trustee sent the petitioner notice of information related to the trust. The probate court denied summary disposition under this statute, and that decision is not at issue in this appeal.

onto the plaintiff's property. *Id*. at 267-268, 273-274. Flooding incidents occurred in the 1990s, in September 2000, and again in May 2004. *Id*. at 272. After concluding that the continuing-wrongs doctrine had been abrogated and was no longer available to the plaintiff, *id*. at 279-281, 285-288, this Court addressed the plaintiff's argument that its claims accrued in May 2004, the time of the last injury, *id*. at 289. This Court reviewed the testimony regarding each of the defendants' wrongful actions and found that they occurred respectively in 1998, in 1995 or 1996, and in 1997. *Id*. at 291. This Court concluded that this testimony "established that the last act of any of the three neighboring defendants at issue occurred in 1998." *Id*. After 1998, the plaintiff "next experienced flooding in June 2001." *Id*. This Court concluded:

> Therefore, it was during this June 2001 flooding that the Froling Trust suffered its first harm from the neighbors' last negligent act. In other words, after the last of the neighbors allegedly acted negligently in 1998, the harm first occurred, or accrued, in June 2001. Accordingly, the subsequent flooding in May 2004 could only have been the continued result of the neighbors' completed conduct. Subsequent claims of additional harm caused by one act do not restart the claim previously accrued. For the purposes of accrual, there need only be one wrong and one injury to begin the running of the period of limitations. In sum, the accrual of the claim occurs when both the act and the injury first occur, that is when the "wrong is done." [*Id*. (footnote omitted).]

The plaintiff's claim accrued with the flooding in June 2001, and therefore, the three-year limitations period expired in June 2004, before the plaintiff filed its claims in November 2004. *Id*. at 291-292.

In *Morse v Colitti*, 317 Mich App 526; 896 NW2d 15 (2016), the plaintiff alleged that in 2009, the defendant improperly installed landscaping blocks and gravel, which "caused water, gravel, and sand to be cast on the '[p]laintiff's property' in such a fashion and with such frequency that it had become a nuisance." *Id*. at 532, 553-554 (alteration in original). Although the defendant's allegedly improper installation occurred in 2009, "the injury, i.e., the flooding of water, gravel, and sand onto plaintiff's property, did not occur until the summer of 2012." *Id*. at 554. Noting that "a claim does not accrue until both the act and the injury occur," this Court concluded that "[b]ecause there was evidence to support that the injury did not occur until the summer of 2012, which, if established, means that the claim did not accrue until 2012, plaintiff's nuisance claim was not barred by the statute of limitations." *Id*.

In their amended petition, petitioners claimed that Vivian never intended to allow Steve to have an opportunity to disinherit them, contrary to Vivian's intentions, and that the LPA in the VSLT was a mistake of fact or law. The relevant dates are December 23, 2002, when Vivian executed the 2002 Restatement that contained the LPA; March 26, 2003, when Vivian died and the VSLT became irrevocable; November 14, 2017, when Steve exercised the LPA to reallocate petitioners' expected distributions to SJMO; and February 12, 2018, when Steve died, at which time his prior exercise of his LPA became irrevocable. The basis of petitioners' claim is that the 2002 Restatement of the VSLT should be reformed to invalidate the LPA because it gave Steve the power to disinherit petitioners, contrary to Vivian's intentions as expressed elsewhere in the trust. The alleged wrong was the wrongful inclusion of the LPA in the VSLT, which allegedly conflicted with Vivian's intentions, and the injury occurred in 2003, when Vivian died and the

VSLT and accompanying LPA became irrevocable. It was at that point that petitioners were harmed because Steve then had the power to use the LPA to petitioners' detriment. Although Steve did not actually use this LPA until 2017, petitioners lost the certainty of any distribution under the VSLT in 2003, before Steve exercised that power. Thus, the circumstances here are most analogous to the circumstances in *Frank*, 500 Mich 133, where the defendant's interference of the member-shareholders' rights constituted the wrongful act, well before the plaintiff realized any monetary damages. As such, the probate court did not err by ruling that petitioners' claim accrued in 2003, and as a result, their petition challenging the validity of the LPA, which was not filed until 2019, was untimely under MCL 600.5813.[2] Accordingly, the probate court properly granted summary disposition under MCR 2.116(C)(7).

## B. DISCOVERY

Petitioners also argue in Docket No. 361518 that the probate court erred by granting Giarmarco's motions for a protective order and to quash a discovery subpoena. We disagree.

"This Court reviews for an abuse of discretion the trial court's decision on a discovery motion." *Kilian v TCF Nat'l Bank*, 343 Mich App 621, 639; 997 NW2d 745 (2022). "The trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *Id*.

"Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claims or defenses and proportional to the needs of the case, taking into account all pertinent factors, including whether the burden or expense of the proposed discovery outweighs its likely benefit, the complexity of the case, the importance of the issues at stake in the action, the amount in controversy, and the parties' resources and access to relevant information." MCR 2.302(B)(1). MCR 2.302(C) provides that a trial court may grant a motion "that justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." This includes an order "that the discovery not be had," MCR 2.302(C)(1), or "that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters," MCR 2.302(C)(4). "With the exception of mandatory initial disclosures under MCR 2.302(A), the discovery rules in subchapter 2.300 apply in probate proceedings[.]" MCR 5.131(B)(1). "Discovery in a probate proceeding is limited to matters raised in any petitions or objections pending before the court." MCR 5.131(B)(3).

Petitioners requested discovery of Steve's tax returns and information regarding his assets and financial information, and Steve's pledges to and communications with SJMO. Petitioners argue that this information was relevant to issues that Giarmarco and SJMO raised in their original motion for summary disposition. In particular, Giarmarco and SJMO had raised the issue that the doctrine of laches barred petitioners' claims because petitioners' delay in asserting their claims

---

[2] We also note that "petitioners possessed copies of the [VSLT] . . . no later than 2009. Yet they did not initiate the instant action to reform the VSLT until 2019." *In re December 23, 2002 Restatement of the Vivian Stolaruk Living Trust* (RIORDAN, J., *dissenting*), unpub op at 2. Thus, even if the claim accrued in 2009, it still was untimely under MCL 600.5813.

prejudiced Steve because he might have structured his estate plan differently if he had known that petitioners would contest his authority to exercise the LPA in the VSLT, and prejudiced SJMO and its patients because SJMO relied on its expectation of Steve's gift pursuant to the LPA. Petitioners argue that the requested documents are relevant to Giarmarco's and SJMO's claims that they were prejudiced by petitioners' delay in contesting the validity of the LPA. Petitioners also argue that Steve's tax records were relevant to the issue whether Steve improperly exercised the LPA in a manner that was economically beneficial to him.

However, after this Court reversed the probate court's original grant of summary disposition on the basis of laches, Giarmarco and SJMO did not attempt to revive their laches defense. Although Giarmarco's and SJMO's second motions for summary disposition were then pending before the probate court, those motions were based on the statute of limitations in MCL 600.5813, which did not require any showing that Steve or SJMO were prejudiced by any delay in petitioners bringing their petition. Thus, prejudice from petitioners' delay was not at issue in the proceedings at the time the probate court granted Giarmarco's motion for a protective order and to quash the discovery subpoena. Further, at the time the probate court granted Giarmarco's motions, there was no claim then pending before the court that Steve improperly exercised the LPA in a manner that was economically beneficial to him. Rather, as the probate court observed, the only claim before it at that time involved the issue whether the LPA was invalid because it conflicted with Vivian's intentions. Petitioners did not demonstrate the relevancy of Steve's tax returns and financial information or his communications with SJMO to the intent issue, or to the issue whether petitioners timely filed their claim under MCL 600.5813. Notably, the probate court did not completely foreclose the possibility that petitioners could pursue their requested discovery in the future because it granted Giarmarco's motions without prejudice, thereby permitting petitioners to again seek relevant discovery if future events justified it. Under these circumstances, the probate court's decision did not fall outside the range of reasonable and principled outcomes. *Kilian*, 343 Mich App at 639.

III. DOCKET NO. 365004

In Docket No. 365004, petitioners argue that the probate court erred by dismissing their petition for a declaration that Steve exercised the LPA in a manner that violated the terms of the VSLT. We disagree.

The probate court dismissed this petition following a bench trial. "This Court reviews the probate court's findings of fact for clear error. A factual finding is clearly erroneous when this Court is left with a definite and firm conviction that a mistake has been made." *In re Estate of Huntington*, 339 Mich App 8, 17; 981 NW2d 72 (2021) (quotation marks and citation omitted). The probate court's construction and interpretation of the language of a trust is reviewed de novo. *In re Stillwell Trust*, 299 Mich App 289, 294; 829 NW2d 353 (2012). "When construing a trust, a court's sole objective is to ascertain and give effect to the intent of the settlor." *Id*. (quotation marks and citation omitted). "Absent ambiguity, the words of the trust document itself are the most indicative of the meaning and operation of the trust." *Id*.

The VSLT created subtrusts identified as the Marital Trust and the Family Trust. Article Nine of the VSLT governed the Marital Trust, and Article Ten governed the Family Trust. Article

Nine, Section 4 of the VSLT, entitled My Spouse's Limited Testamentary Power of Appointment, states, in pertinent part:

> My spouse shall have the limited testamentary power to appoint *to or for the benefit of* my descendants, persons who at any time were married to a descendant of mine, and/or to religious, scientific, charitable, or educational organizations described in IRC Section 501(c)(3), as amended, either by a valid last will and testament or by a valid living trust agreement executed by my spouse, all or any portion of the principal and any accrued and undistributed net income of the Marital Trust as it exists at my spouse's death.

* * *

> This power shall not be exercised in favor of my spouse's estate, the creditors of my spouse's estate, or in any manner that would result in any economic benefit to my spouse. [Emphasis added.]

Similarly, Article Ten, Section 3 of the VSLT, entitled Limited Power of Appointment, provides, in pertinent part:

> My spouse shall have the limited testamentary power to appoint *to or for the benefit of* my descendants, persons who at any time were married to a descendant of mine, and/or to religious, scientific, charitable, or educational *organizations* described in IRC Section 502(c)(3), as amended, either by a valid last will and testament or by a valid living trust agreement executed by my spouse, all or any portion of the principal and any accrued and undistributed net income of the Family Trust as it exists at my spouse's death.

* * *

> This power shall not be exercised in favor of my spouse's estate, the creditors of my spouse's estate, or in any manner that would result in any economic benefit to my spouse. [Emphasis added.]

Furthermore, Article Eighteen, Section 5, entitled Exercise of Power of Appointment, provides, in pertinent part:

> Any trust principle or net income as to which a power of appointment is exercised shall be distributed to the appointee or appointees upon such conditions and estates, in such manner (in trust or otherwise), with such powers, in such amounts or proportions, and at such time or times . . . as the holder of the power may specify in the instrument exercising the power. . . .

### A. APPOINTMENT OF ASSETS TO THE TRUSTEE OF STEVE'S TRUST

Petitioners argue that Article Nine, Section 4 and Article 10, Section 3 unambiguously limit Steve to using the LPA only to appoint assets to Vivian's descendants. We disagree. The phrase "to or for the benefit of" gives the holder of the LPA two options for appointing the available assets

to the three classes of permissible beneficiaries, namely, Vivian's descendants, persons who were married to Vivian's descendants, and qualified organizations. The first option, allowing appointment "to" any of these parties, allows for a direct appointment to the eligible recipient. The second option, allowing appointment "for the benefit of," allows for appointment through a third-party, e.g., a trustee of trust, who will hold the distribution for the benefit of the recipient. There is nothing in the language of the provisions that excludes eligible organizations from the "for the benefit of" option. Additionally the "and/or" conjunction further indicates that there is no differentiation among the three categories of eligible recipients with respect to how Steve may use the LPA to make appointments for their benefit. Moreover, as the probate court found, Article Eighteen, Section 5 is "very specific on the issue of whether the exercise of a power of appointment to someone can be made in trust for that someone." The probate court did not err in its interpretation.

## B. EXPOSURE OF VSLT ASSETS TO STEVE'S CREDITORS

Petitioners argue that the probate court erred by finding that Steve's exercise of the LPA in the VSLT did not expose the VSLT assets to Steve's creditors. We disagree.

Steve's exercise of the LPA in his own trust provides that the subject property "shall not be an asset of Grantor's probate estate, or . . . be treated for any other purpose as if it were an asset of Grantor's probate estate." Petitioners contend, however, that Steve's exercise of the LPA exposed the appointed property to his creditors, given that Article Ten of Steve's trust provides: "Notwithstanding anything contained in this Trust Agreement to the contrary, no expenses, claims, or taxes shall be apportioned to the trust shares established for the beneficiaries named in Paragraphs A through F above." Paragraphs (A) through (F) named individual family members. The remaining beneficiaries, listed in Paragraphs (G) through (M), were charitable organizations, including SJMO in Paragraph (M). Petitioners argue that by excluding the distributive shares to the beneficiaries listed in Paragraphs (A) through (F) from reduction for any claims or expenses in Article Ten, Section 1 of Steve's trust, Steve exposed the beneficiaries listed in Paragraphs (G) through (M) to any expenses, claims, and taxes. According to petitioners, "Steve's exercise of the LPA in favor of the Trustee of his Trust has the effect of combining Vivian's trust assets with Paragraph "M." In other words, petitioners believe that Steve's exercise of the LPA allowed him to appoint funds from the VSLT, combine them with his own assets, and give SJMO a gift under Article Ten, Section 2, Paragraph (M) of his trust, comprised of money from these sources. Petitioners also contend that by combining these two sources for SJMO's gift, Steve exposed the assets in the VSLT to his creditors because it became part of the Article Ten, Section 2, Paragraph (M) gift. In support of their position, petitioners cite Giarmarco's testimony in which he admitted that although he tried to keep assets segregated, the assets in Vivian's trust became titled in the name of Steve's trust. Additionally, petitioners argue that Steve "drafted around the safeguards of MCL 700.7605(4)."

MCL 700.7605(1) and (4) provide:

> (1) The property of a trust over which the settlor has the right without regard to the settlor's mental capacity, at his or her death, either alone or in conjunction with another person, to revoke the trust and revest principal in himself or herself is subject to all of the following, but only to the extent that the settlor's property

subject to probate administration is insufficient to satisfy the following expenses, claims, and allowances:

> (a) The administration expenses of the settlor's estate.

> (b) An enforceable and timely presented claim of a creditor of the settlor, including a claim for the settlor's funeral and burial expenses.

> (c) Homestead, family, and exempt property allowances.

* * *

> (4) For purposes of this section, property held or received by a trust to the extent that the property would not have been subject to a claim against the settlor's estate if it had been paid directly to a trust created under the settlor's will or other than to the settlor's estate, or property received from a trust other than a trust described in this section, shall not be considered trust property available for the payment of the administration expenses, a claim against the settlor's estate, or an allowance described in subsection (1).

Although Steve provided in Article Four, Section 5 of his trust that it was his intent that the property appointed under the VSLT "shall not be an asset of Grantor's probate estate, or be subject to administration by the Personal Representative of Grantor's Will, or otherwise be treated for any other purpose as if it were an asset of Grantor's probate estate," petitioners argue that the "Notwithstanding anything contained in this Trust Agreement to the contrary" language in Article Ten overrides Article 4. They contend that Steve opted out of MCL 700.7605(1), and thereby lost the protection of MCL 700.7605(4). In other words, petitioners assert that Steve violated the terms of the VSLT by channeling the LPA property to his own trust and disposing of it in the same manner that he disposed his own assets.

The probate court did not err by finding that Steve's reference in Article Four, Section 5 to Article Ten, Section 1, Paragraph (M) merely described the condition for granting the LPA funds to SJMO, namely, that SJMO name the patient tower after Vivian and Steve. That is, it "merely point[ed] the trustee to some language contained in the trust that tells it what circumstances under which they will make a distribution to St. Joseph Mercy Oakland." Giarmarco testified that the LPA assets were never commingled with the assets of Steve's trust. Thus, the LPA assets were never subjected to creditors of Steve's trust.

Steve's exercise of the LPA in this case is analogous to *In re Estate of Reisman*, 266 Mich App 522; 702 NW2d 658 (2005). There, the decedent, Geraldine Reisman, established a revocable living trust, which created a marital trust for the benefit of her husband, Samuel Reisman. *Id*. at 524. Geraldine granted Samuel an LPA to appoint assets in her trust to her descendants. *Id*. Samuel exercised the LPA to appoint "all the property to the trustee of his revocable living trust, and directing that it be distributed pursuant to § 5 of his trust." Samuel also provided that the property he appointed would not be an asset of his probate estate or subject to administration by the personal representative of his will, "or otherwise be treated for any purpose as if it were an asset of my probate estate." *Id*. As this Court explained, § 5 of Samuel's trust "provided for

-10-

distribution into issue trusts for his surviving children and, on a per capita basis, to descendants of his deceased children." Samuel later amended § 5 "to state that if petitioners, but not their living descendants, survived him, petitioners should be treated as having predeceased him." *Id*. at 525. The effect of the amendment was "to bypass petitioners in favor of petitioners' children." *Id*.

The petitioners argued that Samuel's transfer of the marital trust assets to his own revocable trust "had the effect of benefiting his own estate and creditors and exposed the marital trust assets to expenses incurred in the operation of the revocable living trust as well as potentially adverse tax consequences." *Id*. at 532. According to the petitioners, "[t]he exposure of the marital trust assets to these potential liabilities . . . constitutes a transfer to the benefit of persons outside of the class delineated" by the decedent. *Id*. This Court rejected that argument because Samuel "specifically transferred the marital trust property to the trustee of his revocable living trust with instructions that those assets were not to become part of his estate, but were to be distributed pursuant to § 5 of his trust." *Id*. This Court concluded that this language "effectively stripped the trustee of any authority to utilize those particular assets for anything other than distribution pursuant to that section." *Id*. This Court further held that MCL 700.7501(4) prohibited third parties from invading the marital trust assets for payment of administration expenses, payment of claims against the husband's estate, and for payment of an allowance. *Id*. at 532-533.

Petitioners argue that *Estate of Reisman* is distinguishable because here the VSLT did not contain language allowing Steve to exercise the LPA "subject to any conditions, trusts, and restrictions as may be determined" by him. Petitioners assert that the VSLT is different than that in *Estate of Reisman* because the VSLT restricted Steve's power to make distributions to only Vivian's descendants. They quote Article Ten, Section 3 of the VSLT, which states that Steve "may make distributions among my descendants in equal or unequal amounts, and on such terms as conditions, either outright or in trust, as my spouse shall determine." They also argue that the trust in *Estate of Reisman* did not contain "controlling language" similar to the language in Steve's trust, Article Ten, Section 1, exposing the beneficiaries listed in Paragraphs (G) through (M) to expenses, claims, and taxes. However, as discussed earlier, the LPA for the VSLT family and marital trusts, and the Article Eighteen, Section 5, definition permitted Steve to appoint VSLT assets to the trustee of his own trust for the benefit of SJMO. Accordingly, the probate court did not err by finding that Steve's exercise of the LPA did not improperly expose the VSLT marital and family trust assets to Steve's creditors.

## C. ECONOMIC BENEFIT TO STEVE

Petitioners' argument that Steve's exercise of the LPA was invalid because it benefited him economically is largely based on a reiteration of their argument that Steve's exercise of the LPA exposed the VSLT assets to his creditors, which we have already rejected.

Petitioners argue that Giarmarco's argument in his first summary disposition motion—that Steve was prejudiced by petitioners' delay in challenging his exercise of the LPA—confirms that Steve exercised the LPA to his benefit. Giarmarco argued that Steve would have structured his estate plan differently if he had known that he could not exercise the LPA in the VSLT in the manner that he did. However, the availability of different options for distributing his assets was not an economic benefit to Steve. There was no evidence that Steve incurred any liability or enforceable obligation to SJMO such that the LPA assets helped Steve satisfy an obligation.

Petitioners fail to present any evidence of any other actual or potential benefit that Steve received from his exercise of the LPA. Accordingly, the probate court did not err by rejecting this argument.

## IV. CONCLUSION

In Docket No. 361518, we affirm the probate court's order granting summary disposition in favor of Giarmarco and its earlier order granting Giarmarco's discovery motion. In Docket No. 365004, we affirm the probate court's order denying petitioners' separate petition for a declaration that Steve exercised the LPA in a manner not permitted by the VSLT.

/s/ Kristina Robinson Garrett
/s/ Michael J. Riordan
/s/ Anica Letica